CONTINENTAL GRAIN CO. *v.* BARGE
FBL–585 ET AL.

No. 229.   Argued April 20, 1960.—Decided June 27, 1960.

*Eberhard P. Deutsch* argued the cause for petitioner. With him on the brief were *Malcolm W. Monroe* and *René H. Himel, Jr.*

*George B. Matthews* argued the cause for respondents. With him on the brief were *Charles Kohlmeyer, Jr.* and *Selim B. Lemle.*

Mr. Justice Black delivered the opinion of the Court.

The single issue presented for decision in this case is whether the United States District Court in New Orleans, acting under 28 U. S. C. § 1404 (a), erred in ordering that this action for damages to cargo from alleged unseaworthiness be transferred for trial, "in the interest of justice," to the United States District Court at Memphis, Tennessee, where the sinking of the barge occurred. The Court of Appeals affirmed the District Court's transfer order. 268 F. 2d 240. We granted certiorari to consider this important question. 361 U. S. 811.

The facts and circumstances on which the District Court transferred this case are these. Barge FBL–585, a respondent here under an ancient admiralty fiction, is owned by Federal Barge Lines, Inc., the other respondent. After the barge was partially loaded by petitioner, Continental Grain Co., with its soybeans at its wharf in Memphis, the barge sank, causing damage both to the barge and to the soybeans. A dispute arose over what caused it to sink. The barge owner, Federal Barge Lines, Inc., brought an action for damages in a Tennessee state court charging that the barge sank because the cargo owner, Continental Grain Co., had been negligent in loading it. The cargo owner later brought this action in the United States District Court in New Orleans against the barge and its owner, in a single complaint, charging that the vessel had sunk because of its defects and unseaworthiness, and claiming damages for injury to the cargo. In the meantime the damage case against the grain company had been removed from the Tennessee state court to the United States District Court at Memphis. While the litigation arising out of this single occurrence was in this posture in the New Orleans and Memphis courts, the barge-owner defendant, at New Orleans, filed a motion and accompanying affidavits under

§ 1404 (a) to transfer "this action" to the United States District Court at Memphis alleging that such transfer was "necessary for the convenience of the parties and witnesses and in the interest of justice. . . ." This followed the language of § 1404 (a), which provides:

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

The New Orleans District Court found that the issue in the Memphis case

"that is, the cause of the casualty, is precisely the issue in the case at bar. The convenience of the great majority of witnesses in this case dictates that this case be tried in Memphis. The efficient administration of justice requires that this claim for cargo damage be tried by the same court which is trying the claim for hull damage, both claims being between the same parties, and relate to the same incident."

These findings were well supported by evidence, were approved by the Court of Appeals, are not challenged here, and we accept them. The case, therefore, if tried in New Orleans, will bring about exactly the kind of mischievous consequences against "the interest of justice" that § 1404 (a) was designed to prevent, that is, unnecessary inconvenience and expense to parties, witnesses, and the public.

The grain company argues that this frustration of the basic purpose of Congress in passing § 1404 (a) is compelled by the language of the section that prevents the transfer of a "civil action" by a District Court to any District Court other than one "where it might have been brought." Two weeks ago this Court decided in *Hoff-*

*man* v. *Blaski* and *Sullivan* v. *Behimer,* 363 U. S. 335, that this language bars transfer of a "civil action" properly pending in one District Court to another in which that "civil action" could not have been brought because the defendant legally could not have been subjected to suit there at the time when the case was originally filed. Those cases involved transfers in which the plaintiffs filing the suits would have had no right whatever to proceed originally against the defendants on the "civil actions" in the District Courts to which transfer was sought with-out the defendants' consent. But in this case there was admittedly a right on the part of the grain company to subject the owner of the barge, with or without its con-sent, to a "civil action" in Memphis at the time the New Orleans action was brought. Under these circumstances it would plainly violate the express command of § 1404 (a), as construed in our two prior cases, to reverse the District Court's judgment ordering this single civil action to be transferred to Memphis, unless transfer is barred by the joinder of the *in rem* claim against the barge with the claim against the owner itself. The grain com-pany takes this view of the effect of joinder, arguing that since the barge was in New Orleans when this "civil action" was brought and the admiralty *in rem* claim there-fore could not have been brought in Memphis at that time, the entire civil action must remain in the inconvenient New Orleans forum. This view is reached by labeling this single civil action as two, one against the barge and one against the owner. It asserts this view despite the fact that the grain company's suit against the barge and its suit against the owner are in the same complaint for the loss of the same cargo in the same sinking of the same barge producing the same damages. The basis of this view that there are two distinct civil actions for § 1404 (a) purposes is a long-standing admiralty fiction that a vessel

may be assumed to be a person for the purpose of filing a lawsuit and enforcing a judgment.[1]

The fiction relied upon has not been without its critics even in the field it was designed to serve. It has been referred to as "archaic," "an animistic survival from remote times," "irrational" and "atavistic."[2] Perhaps this is going too far since the fiction is one that certainly had real cause for its existence in its context and in the day and generation in which it was created. A purpose of the fiction, among others, has been to allow actions against ships where a person owning the ship could not be reached, and it can be very useful for this purpose still. We are asked here, however, to transplant this ancient salt-water admiralty fiction into the dry-land context of *forum non conveniens,* where its usefulness and possibilities for good are questionable at best. In fact, the fiction appears to have no relevance whatever in a District Court's determination of where a case can most conveniently be tried. A fiction born to provide convenient forums should not be transferred into a weapon to defeat that very purpose.

This Court has not hesitated in the past to refuse to apply this same admiralty fiction in a way that would cut

---

[1] "A ship is the most living of inanimate things. Servants sometimes say 'she' of a clock, but every one gives a gender to vessels. And we need not be surprised, therefore, to find a mode of dealing which has shown such extraordinary vitality in the criminal law applied with even more striking thoroughness in the Admiralty. It is only by supposing the ship to have been treated as if endowed with personality, that the arbitrary seeming peculiarities of the maritime law can be made intelligible, and on that supposition they at once become consistent and logical." Holmes, The Common Law (1881), 26–27.

[2] *The Carlotta,* 48 F. 2d 110, 112, 1931 Am. Mar. Cas. 742, 745 (C. A. 2d Cir. 1931), quoted in Gilmore and Black, The Law of Admiralty (1957), 508.

down, as it would here, the scope of congressional enactments. In fact, Mr. Justice Bradley, speaking for the Court, said at one time, in construing a statute which had limited a shipowner's liability but had failed to refer to the "personal" liability of the vessel:

"To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the amount of the property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated . . . ." *The City of Norwich,* 118 U. S. 468, 503.

Fifty-seven years later this Court was confronted with a similar argument about another section of the same statute, and after referring to the analysis in *City of Norwich* concluded,

"The riddle after more than half a century repeated to us in different context does not appear to us to have improved with age. . . . Congress has said that the owner shall not 'answer for' this loss in question. Claimant says this means in effect that he shall answer only with his ship. But the owner would never answer for a loss except with his property, since execution against the body was not at any time in legislative contemplation. There could be no practical exoneration of the owner that did not at the same time exempt his property." *Consumers Import Co.* v. *Kabushiki Kaisha Kawasaki Zosenjo,* 320 U. S. 249, 253–254.

We follow the common-sense approach of these two cases in interpreting § 1404 (a). Failure to do so would practically scuttle the *forum non conveniens* statute so far as admiralty actions are concerned. All a plaintiff would need to do to escape from it entirely would be to

bring his action against both the owner and the ship, as was done here. This would be all the more unfortunate since courts have long recognized "admiralty's approach to do justice with slight regard to formal matters," [3] and, as this Court has recently observed,

> "Admiralty practice, which has served as the origin of much of our modern federal procedure, should not be tied to the mast of legal technicalities it has been the forerunner in eliminating from other federal practices." *British Transport Comm'n* v. *United States,* 354 U. S. 129, 139.

It is relevant that the law of admiralty itself is unconcerned about the technical distinctions between *in rem* and *in personam* actions for purposes of transferring admiralty actions from one court to a more convenient forum. This Court's Admiralty Rule 54, which prescribes the procedures for owners' limiting their liability after vessels have been libeled, provides in language broader than § 1404 (a): "The District Court may, in its discretion, transfer the proceedings to any district for the convenience of the parties." And it may be further observed that courts have not felt themselves bound by this fiction when confronted with the argument that because *in rem* and *in personam* actions involve different parties, therefore *res judicata* does not apply from an *in personam* action against an owner to an *in rem* action against his ship.[4] It is interesting in this connection to take note of the fact that, according to the Court of

---

[3] *Point Landing, Inc.,* v. *Alabama Dry Dock & Shipbuilding Co.,* 261 F. 2d 861, 866, 1959 Am. Mar. Cas. 148, 155 (C. A. 5th Cir. 1958).

[4] See *Burns Bros.* v. *Central R. Co.,* 202 F. 2d 910, 1953 Am. Mar. Cas. 718 (C. A. 2d Cir. 1953); *Sullivan* v. *Nitrate Producers' S. S. Co.,* 262 F. 371 (C. A. 2d Cir. 1919); *Bailey* v. *Sundberg,* 49 F. 583 (C. A. 2d Cir. 1892); Gilmore and Black, The Law of Admiralty (1957), 507–509.

Appeals opinion, the case at Memphis has already been tried.[5] To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404 (a) was designed to prevent. Moreover, such a situation is conducive to a race of diligence among litigants for a trial in the District Court each prefers. These are additional reasons why § 1404 (a) should not be made ambiguous by the importation of irrelevant fictions.

The idea behind § 1404 (a) is that where a "civil action" to vindicate a wrong—however brought in a court—presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court. That situation exists here. Although the action in New Orleans was technically brought against the barge itself as well as its owner, the obvious fact is that, whatever other advantages may result, this is an alternative way of bringing the owner into court. And although any judgment for the cargo owner will be technically enforceable against the barge as an entity as well as its owner, the practical economic fact of the matter is that the money paid in satisfaction of it will have to come out of the barge owner's pocket—including the possibility of a levy upon the barge even had the cargo owner not prayed for "personified" *in rem* relief. The crucial issues about fault and damages suffered were identical, whether considered as a claim against the ship or its owner. The witnesses were identical. Thus, while two methods were invoked to bring the owner into court and enforce any judgment against it, the substance of what had to be done to adjudicate the rights of the parties was not different at all.

---

[5] 268 F..2d 240, 242, n. 2, 1959 A. M. C. 2158, 2160, n. 2.

Treating both methods for § 1404 (a) purposes for what they are in a case like this—inseparable parts of one single "civil action"—merely permits or requires parties to try their issues in a single "civil action" in a court where it "might have been brought." To construe § 1404 (a) this way merely carries out its design to protect litigants, witnesses and the public against unnecessary inconvenience and expense, not to provide a shelter for *in rem* admiralty proceedings in costly and inconvenient forums.

For the reasons stated here the judgment is

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins.

Although this case also involves some nice questions of admiralty procedure, since the claimant barge owner has moved for transfer and has agreed to "pay any final decree which may be rendered against" the barge, the controlling considerations for me are those set forth in my opinion in *Sullivan* v. *Behimer*, 363 U. S. 351. Accordingly, I would affirm the judgment.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE DOUGLAS joins, dissenting.

I think that this case, if its true facts be recognized and faced, is controlled by the Court's opinion in *Hoffman* v. *Blaski* and *Sullivan* v. *Behimer,* decided just the other day, 363 U. S. 335. I also think that the Court's opinion fails to recognize and face the crucial fact—that one of the two claims in this "civil action" was brought *in rem* against the Barge, not as an attachment or "device" to force appearance of the owner or to provide security for the payment of any *in personam* judgment which might be recovered against the owner, but as a personified "debtor or offending thing" as the settled law author-

izes [1]—which gives rise to the principal question that produces my disagreement. Indeed, I think the Court's opinion endeavors to sweep that crucial fact "under the rug." I will now undertake to make a plain and chronological statement of the simple facts.

On July 2, 1958, petitioner, Continental Grain Company,[2] brought this libel *in personam* against Federal Barge Lines, Inc.,[3] and *in rem* against Barge FBL–585 ("Barge"), in and on the admiralty side of the United States District Court for the Eastern District of Louisiana, New Orleans Division—where the Barge then was, and ever since has been, located—to recover damages in the sum of $90,000 to petitioner's cargo, caused by the alleged unseaworthiness and consequent partial sinking of the Barge while being loaded at Memphis, Tennessee, on November 6, 1957. The libel prayed a decree against both Federal Barge Lines, Inc., and Barge FBL–585, for the cargo damage; that Federal Barge Lines, Inc., be cited to appear and answer; that process issue against "Barge FBL–585 and that all persons claiming any interest in said vessel be cited to appear and answer this libel," and that "Barge FBL–585 be condemned and sold to pay the amount due libelant herein."

After Federal Barge Lines, Inc., was served with process, and after process had issued against the Barge but before actual arrest of the Barge thereunder, Federal Barge

---

[1] See note 15, *infra*.

[2] Petitioner, Continental Grain Company, is a Delaware corporation maintaining its principal office in New York, New York, but is also authorized to do and is doing business in the City of Memphis in the Western District of Tennessee.

[3] Federal Barge Lines, Inc., a Delaware corporation, is a common carrier by water, operating on the Mississippi River and its principal tributaries, and has offices and does business in, among other places, Memphis, Tennessee, and New Orleans, Louisiana.

Lines, Inc., on July 23, 1958, delivered its letter addressed to petitioner, which the latter accepted and has acted on, saying, in pertinent part, that: "In consideration of your not having seized [the barge], under the *in rem* process which has been issued . . . and in further consideration of our not being required to post the usual bond for the release of that vessel, [w]e agree that we shall . . . file claim to Barge FBL 585 and [shall file] pleadings in the . . . action, and that, [whether the] vessel [be] lost or not, we shall pay any final decree which may be rendered against said vessel in said proceeding." The last paragraph of the letter said:

> "It is the intent of this undertaking that the rights of the libelant and claimant-respondent in this proceeding shall be, and for all purposes shall be taken to be, precisely the same as they would have been had the vessel, in fact, been taken into custody by the United States Marshal under said *in rem* process, and released by the filing of claim and release bond, we, as claimant, reserving in behalf of the vessel all other objections and defenses otherwise available except those which might be predicated upon the fact that the vessel was not actually so seized."

Accordingly, on July 29, 1958, Federal Barge Lines, Inc., filed its claim to "Barge FBL–585, proceeded against herein, and claim[ed] the said barge as owner and pray[ed] that it be permitted to defend according to law"; and on September 18, 1958, it filed its answer to the libel.

On October 13, 1958, Federal Barge Lines, Inc., filed its motion to transfer "this action to the United States District Court for the Western District of Tennessee, Western Division, on the ground that such transfer is

necessary for the convenience of the parties and witnesses and in the interest of justice as will appear from the affidavit attached hereto and made a part hereof." [4] After hearing, the District Court granted the motion and ordered the action transferred as requested by the movant, but the district judge, acting under the Interlocutory Appeals Act, 28 U. S. C. § 1292 (b), "certified that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation." [5]

Petitioner then sought and was allowed an appeal by the Court of Appeals under 28 U. S. C. § 1292 (b).[6]  That

---

[4] The principal averments of the affidavit referred to were (1) that on June 27, 1958, Federal Barge Lines, Inc., filed an action at law against petitioner, Continental Grain Company, in the Circuit Court of Shelby County, Tennessee, for damages to its Barge FBL–585, caused by the alleged negligence of the grain company in loading it at Memphis on November 6, 1957, which action was removed by the grain company to the United States District Court for the Western District of Tennessee on July 15, 1958, and (2) that the necessary witnesses reside in or nearer to Memphis than to New Orleans.

[5] In his unpublished *per curiam* the district judge said, *inter alia,* "The libel is in rem as to the Barge FBL–585. While this libel could have been originally brought in the Western District of Tennessee against the respondent, Federal Barge Lines, the owner of the barge, the libel as to the barge itself would ordinarily be restricted to the place where the barge is located at the time the libel is filed. At that time, and now, the barge is located in this district. However, since the barge was neither seized by the Marshal nor bonded by respondent, libellant having accepted respondent's letter undertaking to respond to any decree entered herein, and since the owner thereof, Federal Barge Lines, apparently is financially able to respond to any decree rendered against it, the interest of justice would best be served by . . . transferring this case to the Western District of Tennessee."

[6] The District Court stayed its order of transfer, pending determination of the appeal.

court, relying heavily on its opinion in *Ex parte Blaski*, 245 F. 2d 737, affirmed, 268 F. 2d 240, and we granted certiorari, 361 U. S. 811.

Although the Court of Appeals found "that fair application of the letter undertaking . . . requires that we treat it as though, upon the libel being filed, the vessel had actually been seized, a Claim filed, a stipulation to abide decree with sureties executed and filed by Claimant, and the vessel formally released," it held that, inasmuch as the claimant-respondent had by its motion to transfer consented "to an unlimited submission of the cause [to the Tennessee District Court] even though it could not have been filed there initially," transfer of the *in rem* action to that court "presents no real or conceptual difficulties," because "[t]he Court does not undertake to transfer the *res*, nor does it even attempt to transfer the cause while the *res* is still in custody of the Court"; that when, as here, a "bond (stipulation)" is given and substituted for the vessel "[t]raditional notions are not affected if that security floats with the cause wherever the law navigates it." *Id.*, at 243, 244.

It is not disputed that the libel, insofar as it is *in personam*, might have been brought by petitioner against respondent, Federal Barge Lines, Inc., in the United States District Court for the Western District of Tennessee, as that court had jurisdiction to entertain such an action and Federal Barge Lines, Inc., was amenable to the service of monition there. Hence, if this libel had been brought only *in personam* against Federal Barge Lines, Inc.—*i. e.*, had omitted the claim *in rem* against the Barge—it could have been transferred to the Tennessee District, for such an action could have been brought in that forum. But, as the parties agree, petitioner had a legal right to join in one action, as it did here, a claim *in personam* against Federal Barge Lines, Inc., and one

*in rem* against the Barge.[7]  The Court's opinion says that, because the claim *in personam* might have been brought in the Memphis forum, it is a mistake to say that "the entire civil action must remain in the inconvenient New Orleans forum."  But respondent's motion did not ask transfer of only the claim *in personam,* if indeed the court could have severed the two claims and have transferred one and kept the other—a matter not at all dealt with in the Court's opinion.  Instead it asked transfer of the whole action, and so we are presented with the question whether an admiralty action *in rem,* or partly *in rem,* may be transferred, upon application of the claimant of the *res,* to a district in which the *res* is not located, and in which the libellant did not have a legal right to bring it.

The Court treats this case as a "single" damage action against only the barge owner.  That treatment simply ignores the crucial fact which gives rise to the question we have here.  Of course, if this were simply a "single" action for damages against only the barge owner we would not have the question that confronts us, for we all agree that such an action "might have been brought" in the Memphis forum, and, hence, if brought elsewhere it could have been transferred to that forum under § 1404 (a).  But those are not the facts.  The facts are that there were two claims in *this* "civil action," one *in personam* against the owner, and one *in rem* against the Barge.  And we cannot decide the question presented by denying its existence or by ignoring the facts that created it.  One of the two claims of *this* "civil action" was *in rem* against the Barge.  The Barge was in New Orleans when this suit was brought.  Therefore, *this* "civil action" could not

---

[7] *Newell* v. *Norton,* 3 Wall. 257; *In re Fassett,* 142 U. S. 479, 484 ("The District Court has jurisdiction to determine the question, because it has jurisdiction of the vessel by attachment, and of Fassett by monition . . . ."); *The Resolute,* 168 U. S. 437, 442; *Turner* v. *United States,* 27 F. 2d 134, 136 (C. A. 2d Cir.).

have been brought in Memphis, and, hence, cannot be transferred to that forum if the limiting words of § 1404 (a), "where it might have been brought," are to have any meaning.

Petitioner, relying on the established principle that an action *in rem* may be brought only in the district where the *res* is located,[8] or possibly, under the accustomed practice in admiralty, in the district where, as alleged in the libel, the *res* (vessel) will be "during the pendency of the process [issued on the libel],"[9] contends that inasmuch as the Barge was located in the Eastern District of Louisiana when the libel was filed, *this action* could not have been brought or prosecuted in any other district and, hence, the court was without power, under 28 U. S. C. § 1404 (a),[10] to transfer it, upon respondents' motion and even with their waiver of venue and jurisdiction, to the Western District of Tennessee, where it could not have been brought by the libellant. This contention accords with our opinion in the *Blaski* and *Behimer* cases, 363 U. S. 335.

---

[8] *The Ann,* 9 Cranch 289, 291; *Miller* v. *United States,* 11 Wall. 268, 294; *United States* v. *Mack,* 295 U. S. 480, 484; *Clinton Foods* v. *United States,* 188 F. 2d 289, 292 (C. A. 4th Cir.); *Fettig Canning Co.* v. *Steckler,* 188 F. 2d 715, 717–718 (C. A. 7th Cir.). Cf. *Torres* v. *Walsh,* 221 F. 2d 319, 321 (C. A. 2d Cir.); *Broussard* v. *The Jersbek,* 140 F. Supp. 851, 852–853.

[9] Notwithstanding the provision of Admiralty Rule 22 (28 U. S. C. p. 5226) that if the libel be *in rem* it shall state "that the property is within the district," we are told that in practice the common, if not universal, jurisdictional statement in libels *in rem* recites "That the vessel now is, or, during the pendency of process herein, will be, within the District and the jurisdiction of the Court." See *Internatio-Rotterdam, Inc.,* v. *Thomsen,* 218 F. 2d 514, 515–516 (C. A. 4th Cir.)—in some other aspects an anomalous opinion.

[10] "§ 1404. Change of venue.

"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

But respondents contend that an admiralty court is not subject to the provision of § 1404 (a) limiting the transfer of an action to a district "where it might have been brought," but is empowered by Admiralty Rule 44 to transfer an action, on the motion of the claimant-respondent and a mere showing of convenience, to any other district. This contention is wholly without merit. Admiralty Rule 44,[11] which in effect authorizes District Courts to formulate local rules of practice, is expressly limited to "cases not provided for by these rules or by statute . . . ." The matter of transferring "any civil action"—which phrase includes actions in admiralty [12]— is expressly prescribed by a statute. Section 1404 (a) expressly limits a District Court's power to transfer a civil action to a district or division "where it might have been brought." *Hoffman* v. *Blaski, supra.* The power to transfer actions cannot derive from local practice but only from substantive law. Nor is there any showing here that the District Court has ever even purported to promulgate any applicable local rule of practice.

Respondents next contend that even if § 1404 (a) applies to the transfer of admiralty actions, that section does not preclude transfer of an admiralty action *in rem* to a district where the *res* is not located if the claimant-respondent, after having prevented the arrest or procured the release of the *res* by giving bond or other acceptable security, so moves and agrees to submit to the jurisdic-

---

[11] Rule 44. "Right of Trial Courts To Make Rules of Practice

"In suits in admiralty in all cases not provided for by these rules or by statute, the District Courts are to regulate their practice in such a manner as they deem most expedient for the due administration of justice, provided the same are not inconsistent with these rules."

[12] *Torres* v. *Walsh*, 221 F. 2d 319, 321 (C. A. 2d Cir.) ; *Internatio-Rotterdam, Inc.,* v. *Thomsen,* 218 F. 2d 514, 515 (C. A. 4th Cir.), and see *Ex parte Collett,* 337 U. S. 55, 58; *United States* v. *National City Lines, Inc.,* 337 U. S. 78.

tion of the transferee court. They argue that authority to proceed in admiralty against the *res* (vessel) is a mere security device and, after the claimant-respondent has prevented the arrest or procured the release of the *res* by giving bond or other acceptable security, the *in rem* action is converted into one *in personam,* and may accordingly be transferred under § 1404 (a), on motion of the claimant-respondent (but not of the libellant) [13] and a finding of convenience, to any other district in which the action if originally *in personam* "might have been brought." The Court appears to agree with that argument. It criticizes the settled doctrine of personification of the ship. It says that "perhaps [it] is going too far [to refer to the fiction of personification of the ship] as 'archaic,' 'an animistic survival from remote times,' 'irrational' and 'atavistic' " (citing *The Carlotta,* 48 F. 2d 110, 112), but it does not suggest that the numerous cases of this Court which have established and adhered to that "fiction" for more than 150 years should be overruled—something I could understand, even at this late day. Instead, it seems merely to brush them aside or to fail to recognize their application here.

But admiralty proceedings *in rem* are not a mere security device. From its earliest history to the present time,

---

[13] Respondents say in their brief:

"A transfer on motion of a claimant and a transfer on motion of a libellant are two different things. We do not here contend, and it is our submission that it would be error for a Court to hold, that a coercive transfer of a claimant to a different jurisdiction than that in which the suit was filed is proper. The concept of transferee jurisdiction is that there must be two available forums, and unless the moving party is the claimant, there is no secondary or transferee forum to which the case could be transferred."

Nothing in § 1404 (a), or in its legislative history, suggests such a unilateral objective and we should not, under the guise of interpretation, ascribe to Congress any such discriminatory purpose. See *Hoffman* v. *Blaski,* 363 U. S. 335, 344.

this Court has consistently held that an admiralty proceeding *in rem* is one essentially *against the vessel itself as the debtor or offending thing;* and, in such an action, the vessel itself is impleaded as the defendant, seized, judged and sentenced.[14] In *Rounds* v. *Cloverport Foundry,* 237 U. S. 303, Mr. Justice Hughes, in distinguishing between *in rem* actions against a vessel, on the one hand, and attachments against a vessel to force appearance of the respondent or to provide security in an action *in personam,* on the other hand, said:

"Actions *in personam* with a concurrent attachment to afford security for the payment of a personal judgment are in a different category. *The Belfast, supra; Taylor* v. *Carryl,* 20 How. 583, 598, 599; *The Robert W. Parsons, supra.* And this is so not only in the case of an attachment against the property of the defendant generally, but also where it runs specifically against the vessel under a state statute providing for a lien, if it be found that the attachment was auxiliary to the remedy *in personam. Leon* v. *Galceran,* 11 Wall. 185; see also *Johnson* v. *Chicago &c. Elevator Co.,* 119 U. S. 388, 398, 399; *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, 646, 648." *Id.,* at 307.

---

[14] *The Mary,* 9 Cranch 126, 144; *The Moses Taylor,* 4 Wall. 411; *The Belfast,* 7 Wall. 624; *The Glide,* 167 U. S. 606; *The Robert W. Parsons,* 191 U. S. 17; *Rounds* v. *Cloverport Foundry,* 237 U. S. 303, 306–307.

"A ship is the most living of inanimate things. Servants sometimes say 'she' of a clock, but every one gives a gender to vessels. And we need not be surprised, therefore, to find a mode of dealing which has shown such extraordinary vitality in the criminal law applied with even more striking thoroughness in the Admiralty. It is only by supposing the ship to have been treated as if endowed with personality, that the arbitrary seeming peculiarities of the maritime law can be made intelligible, and on that supposition they at once become consistent and logical." Holmes, The Common Law (1881), 26–27.

Indeed, the absence of liability of the owner of a vessel does not necessarily exonerate the vessel itself.[15]  If, for example, a vessel under bareboat charter damages another as the result of the negligence of her crew, the vessel is liable *in rem* even though an action *in personam* would not lie against her owner.[16]  Likewise, the right of one damaged by the wrong of a vessel to proceed against her follows her into the hands of an innocent purchaser, although the latter is not liable *in personam*.[17]  Similarly, a vessel is liable *in rem* for damages resulting from her negligent operation by an independent pilot to whose control the law required her to be confined, although her owner is not liable *in personam*.[18]

The cases cited by the Court,[19] holding that in expressly exonerating by statute shipowners from certain ·liabilities for casualty losses of cargo at sea, Congress similarly intended to exonerate their property, *i. e.,* their ships, from such liabilities, are wholly inapposite.  They involved only interpretation of particular statutes, and did not at all deal with, and certainly were not intended to destroy, for they expressly recognized, the historic differ-

---

[15] "Such personification of the vessel, treating it as a juristic person whose acts and omissions, although brought about by her personnel, are personal acts of the ship for which, as a juristic person, she is legally responsible, has long been recognized by this Court." *Canadian Aviator, Ltd.,* v. *United States,* 324 U. S. 215, 224.

[16] *The Barnstable,* 181 U. S. 464.  The "settled rule is that where the ship-owner provides the vessel only, and the master and crew are selected by the charterer, the latter and not the ship-owner is responsible for their acts." *The China,* 7 ·Wall. 53, 70.

[17] "The maritime 'privilege' or lien . . . accompanies the property into the hands of a bona fide purchaser." *Vandewater* v. *Mills,* 19 How. 82, 89.  See also *The China,* 7 Wall. 53, 68; *The John G. Stevens,* 170 U. S. 113.

[18] *The China,* 7 Wall. 53; *Homer Ramsdell Transp. Co.* v. *La Compagnie Générale Transatlantique,* 182 U. S. 406.

[19] *The City of Norwich,* 118 U. S. 468, 503; *Consumers Import Co.* v. *Kabushiki Kaisha Kawasaki Zosenjo,* 320 U. S. 249, 253–254.

ence and distinction between admiralty actions *in personam* and those *in rem*. Nor does this Court's Admiralty Rule 54, discussed by the Court, touch the question of transferability of this case. This is not a limitation of liability proceeding, specially covered by that Rule, and the parties make no such claim. Rather we have here only a simple motion to transfer a "civil action" from one District to another, and such a motion is exclusively governed by § 1404 (a).

The Barge itself being the "offending thing," and here being itself subject to suit, and having been sued, *in rem*, we think it may not be said that the giving by respondent, Federal Barge Lines, Inc., and the acceptance by petitioner, of the "letter undertaking," to prevent the physical arrest of the Barge, converted the *in rem* action into one *in personam*. That letter expressly said that the rights of the parties would for all purposes be "precisely the same as they would have been had the vessel, in fact, been taken into custody by the United States Marshal under said *in rem* process, and released by the filing of claim and release bond . . . ." That this letter was legally effective in accordance with its terms is not disputed. This Court has from an early day consistently held that a bond, given to prevent the arrest or to procure the release of a vessel, *is substituted for and stands as the vessel in the custody of the court.*[20] Inasmuch as

---

[20] *The Palmyra*, 12 Wheat. 1, 10; *The Webb*, 14 Wall. 406, 418; *The Wanata*, 95 U. S. 600, 611; *United States* v. *Ames*, 99 U. S. 35. In Judge Woolsey's very perceptive opinion in *J. K. Welding Co.* v. *Gotham Marine Corp.*, 47 F. 2d 332, 335 (D. C. S. D. N. Y.), the rule was summarized as follows:

"The stipulation for value is a complete substitute for the *res*, and the stipulation for value alone is sufficient to give jurisdiction to a court because its legal effect is the same as the presence of the *res* in the court's custody." See also Gilmore and Black, The Law of Admiralty, at 650–651.

the parties agreed that the letter involved here was to have precisely the same effect as a bond, it follows that the letter is, just as a bond would have been, a substitute for the vessel in the custody of the court, and that the giving and accepting of the letter did not convert the *in rem* action into one *in personam*.

Respondents finally argue that even though the Barge itself could be and was sued as the "offending thing" and, being located in the district of suit, this action *in rem* against it could not have been brought elsewhere without respondent's consent, it was as possible for the Barge voluntarily to enter appearance in and submit to the venue and jurisdiction of the transferee court as it would have been for one sued *in personam* to do so,[21] and that their motion to transfer had that effect. Whether jurisdiction over a *res* in an action *in rem* may be conferred by consent of its owner, given either before or after the action has been brought, upon a court that does not have territorial jurisdiction or custody of the *res* we need not decide, for the question here is not such, but, rather, it is simply whether a District Court is empowered by § 1404 (a) to transfer such an action to a district in which the libellant did not have the right to bring it, independently of the will or wishes of the claimant-respondent. That question was ruled in the negative by *Hoffman* v. *Blaski*, 363 U. S. 335, and I think it follows that the judgment in this case should be reversed.

---

[21] See *J. K. Welding Co.* v. *Gotham Marine Corp.*, 47 F. 2d 332, 335 (D. C. S. D. N. Y.).