ZIMMERMAN
UNLICENSED

| Plf. | Plf. | Plf. | Plf. | Plf. | Plf. |

**S.E.L. MADURO (FLORIDA), INC., a Florida Corporation, Plaintiff,**

**v.**

**The M/V ANTONIO de GASTENATA, Defendant.**

**No. 85–2959–CIV–EPS.**

United States District Court,
S.D. Florida,
Miami Division.

July 24, 1986.

John Campbell, Holland & Knight, Miami, Fla., Philip V. Moyles, New York City, for claimants.

Timothy J. Armstrong, Armstrong & Mejer, P.A., Coral Gables, Fla., for plaintiff.

## MEMORANDUM OPINION & ORDER ENTERING SUMMARY JUDGMENT IN FAVOR OF CLAIMANTS

SPELLMAN, District Judge.

### I

### BACKGROUND

This CAUSE comes before the Court on the Claimants', BANCO de CREDITO INDUSTRIAL, S.A. and SOCIEDAD de GESTION de BUQUES, S.A., Motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for the Entry of Summary Judgment.

The Plaintiff, S.E.L. Maduro Inc., is a Florida Corporation with its principal place in Dade County, Florida. Naviera Gorbea [hereafter NAVIERA GORBEA] is a business entity organized and existing under the laws of Spain with its principal place of business in Spain. The Claimants contend that Naviera Gorbea was the owner of the Defendant, the M/V Antonio De Gastenata from 1981 to 1985. The Banco de Credito Industrial, S.A. [hereafter BCI] is a Spanish business entity owned and operated by the Government of Spain with its principal place of business in Spain. BCI claims to be the current owner of the M/V Antonio de Gastenata. The Plaintiff, however, disagrees with this assertion, and believes that "BCI has been named administrator of the vessel," and that no documents indicate a change of ownership actually occurred. *See* Response to Claimants' Local 10(J)(2) Statement of Facts at ¶ 3. Sociedad de Gestion de Buques, S.A. [hereafter SGB], a Claimant herein, is a Spanish business entity owned and operated by the Government of Spain with its principal place of business in Spain. While SGB claims to be the current operator of the vessel, the Plaintiff states that it has no knowledge in this regard.

In essence, the dispute *sub judice* and the Cause already tried before the Honorable Edward B. Davis, *S.E.L. Maduro (Florida), Inc. v. Naviera Gorbea, S.A. & Jose L Gervas,* 83–2562–CIV–DAVIS, revolves around a meeting that took place on December 10, 1982 between Jose L. Gervas, principal of Naviera Gorbea, and Leo McKay, the President of Maduro, in Miami, Florida. Neither party denies that such an encounter occurred, but the versions of what actually transpired there are at odds. According to the Claimants:

McKay informed Gervas that MADURO had a claim for $595,000.00 for services rendered to the three NAVIERA GORBEA vessels. McKay claimed that MADURO had a maritime lien in the three NAVIERA GORBEA owned vessels based upon the services rendered to the CHARTERER, Span-Chile. McKay told Gervas that MADURO intended to arrest the NAVIERA GORBEA vessels *in rem* to seek enforcement of a maritime lien for services rendered in the amount of

$595,000.00. In order to prevent the arrest and detainment of the vessels which were then under Charter and operating out of United States ports, Gervas signed a contract with MADURO agreeing to the $595,000.00 debt which MADURO claimed was due for maritime liens on the NAVIERA GORBEA vessels. *See* Exhibit 19, Appendix B.

Claimants' Local Rule 10(J)(2) Statement of Facts at ¶ 11. The Plaintiff's version of that meeting between Mr. Gervas and Mr. McKay is as follows:

Mr. McKay informed Mr. Gervas that $595,016 represented charges against vessels owned by NAVIERA GORBEA and chartered to SPAN–CHILE. MADURO denies that 'McKay claimed that MADURO had a maritime lien in the three NAVIERA GORBEA owned vessels based upon the services rendered to the Charterer, Span-Chile." MADURO denies that 'McKay told Gervas that MADURO intended to arrest the NAVIERA GORBEA vessels *in rem* to seek enforcement of a maritime lien for services rendered in the amount of $595,000." Gervas signed the document dated December 10, 1982, a copy of which is included as Exhibit 19 to Claimants' Appendix B. What Mr. Gervas' motive actually was in signing the document is beyond MADURO's knowledge. NAVIERA GORBEA and its attorneys denied, however, that the signed document was a contract or agreement. Marine necessaries and supplies included in the $595,-016 charges constituted maritime liens against specific vessels. Such charges were incurred not only by the charterer but also by the owner. MADURO denies that Exhibit 19 of Appendix B has any pertinence to the allegations in paragraph 11 of Claimants' Statement.

Plaintiff's Response to Claimants' Local 10(J)(2) Statement of Facts at ¶ 11.

On October 12, 1983, Maduro filed suit in the United States District Court for the Southern District of Florida against Naviera Gorbea, S.A. and Jose L. Gervas, alleging breach of the December 10, 1982 agreement. In *S.E.L. Maduro (Florida), Inc. v. Naviera Gorbea, S.A., & Jose L. Gervas,* 83–2562–CIV–DAVIS (hereafter MADURO I), the Plaintiff sought recovery for services rendered to three Naviera Gorbea Vessels, the M/V Blas de Lezo, the M/V Bernardo de Zamcola, and the M/V Antonio De Gastenata. In the Complaint in that action (*see* Exhibit 8 of Appendix B to the Motion for Summary Judgment), the Plaintiff alleged that Gorbea chartered the vessels to Compania Maritima Span-Chile, S.A., a Chilean entity engaged in transporting cargo as a common carrier by water for hire. The Plaintiff further alleged that during 1981 and 1982 it furnished stevedoring and other labor, materials, and supplies constituting marine necessaries for the vessels. It also claimed that during December of 1982, Maduro representatives met with Gervas, and in consideration of Maduro's agreement to refrain from foreclosing its maritime liens on one or more of the vessels, Gervas executed a written agreement or promissory note on Gorbea's behalf. In Count I, the Plaintiff claimed it had sustained damage as a result of Gorbea's breaches. In Count II, the Plaintiff claimed it sustained damages as a result of the Defendants' misrepresentations.

On August 28, 1985 Maduro filed the instant lawsuit (hereafter MADURO II) seeking to recover $148,000 plus interest against the M/V Antonio de Gastaneta *in Rem.* In the Complaint (*See* Exhibit 10 of Appendix B to the Motion for Summary Judgment), the Plaintiff alleges that it furnished stevedoring and other marine necessaries and supplies to the M/V Antonio de Gastaneta, that subsequently the M/V Antonio de Gastaneta defaulted in its obligation to pay amounts due Maduro, and refused to remedy these defaults despite demand.

MADURO I was tried by a jury before the Honorable Edward B. Davis in March of 1986. This Court has before it a copy of the trial transcript, Composite Exhibit 1 to Appendix A. On March 20, 1986, the jury

returned its verdict finding "No breach of contract by Defendant." *See* Exhibit 15 of Appendix B. On March 31, 1986, Judge Davis entered Judgment based on the jury's verdict. *See* Exhibit 16 of Appendix B.

The question before this Court on the Motion for Summary Judgment is really quite narrow: under the doctrines of *res judicata* and collateral estoppel is the Plaintiff precluded by the judgment in MADURO I from maintaining the action in MADURO II? The Claimants' position is that the claims raised in both cases arise out of the same nucleus of operative facts. According to the claimants, the only significant difference between the two actions is that MADURO I involved claims for all three Naviera Gorbea vessels and MADURO II involves only claims for goods and services allegedly rendered to one of the three Naviera Gorbea vessels. The claimants, in effect, perceive the matter before this Court as a slice of the larger action already tried, resolved, and closed before Judge Davis.

Maduro agrees with one of the Claimants' points—that the invoices showing goods provided and services rendered to the M/V Antonio de Gastaneta and introduced into evidence in MADURO I will be utilized as evidence in MADURO II and that services to the vessel are involved in both cases. The Plaintiff, however, disagrees with the Claimants that the doctrines of *res judicata* and collateral estoppel preclude them from maintaining this action. They insist that the claims raised in MADURO I and in this suit do not arise out of the same nucleus of operative facts. The Plaintiff points out that the earlier case involved a breach of contract claim against the shipowner and its principal *in personam* while this case involves a statutory lien foreclosure against the M/V Antonio de Gastaneta *in rem.*

This Court is mindful of the burden to be borne by a litigant seeking to prevail on a Motion for Summary Judgment. The Movant must demonstrate that there is no dispute as to any material fact in the case.

*See Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In assessing whether the burden has been met, courts should view the evidence in the light most favorable to the opposing party. *See id; Clemons v. Dougherty, Georgia,* 684 F.2d 1365, 1368 (11th Cir.1982). After reviewing the Claimants' Motion for Summary Judgment, the Plaintiff's Memorandum in Opposition, the Affidavits, the Exhibits, and the file in the above-styled Cause, this Court is of the opinion that the Claimants have met their burden and are entitled to a Judgment as a matter of law.

## II

### RES JUDICATA

■ First, this Court, for the following reasons, is of the opinion that under the doctrine of *res judicata*, the Judgment in the *in personam* action in MADURO I operates as an absolute bar to the subsequent *in rem* action in MADURO II.

The Court in *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955) sets forth the "basic distinction between the doctrines of *res judicata* and collateral estoppel" as follows:

[U]nder the doctrine of *res judicata,* a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit.

The Plaintiff herein attempts to resurrect the abandoned doctrine of mutuality in their argument that these "Claimants must show not only that the parties or their privies are identical but also that the causes of action are the same in the two lawsuits." Memorandum in Opposition to

Claimants' Motion for Summary Judgment at Page 3. Under the doctrine of mutuality of parties, neither party could raise a prior judgment as an estoppel against the other unless both parties were bound by the judgment. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). The mutuality requirement permitted a party who had already litigated and lost in one suit, an opportunity to try again with the identical issues, only with new parties. *See id; Blonder-Tongue Laboratories Inc. v. University of Illinois Foundation,* 402 U.S. 313, 327-30, 91 S.Ct. 1434, 1442-43, 28 L.Ed.2d 788 (1971). The Court in *Blonder-Tongue,* thus, rejected this mutuality requirement as applied to cases where a patentee sought to relitigate the validity of a patent after a federal court had already found it to be invalid.

In *Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) the Court extended the *Blonder-Tongue* holding and stated that the doctrine under which neither party could use a prior judgment against the other unless both parties were bound by the same judgment no longer applies. The Court then distinguished between the defensive and offensive use of estoppel:

> The *Blonder-Tongue* case involved defensive use of collateral estoppel—a plaintiff was estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant. The present case, by contrast involves offensive use of collateral estoppel—a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff.

*Id.* 439 U.S. at 329, 99 S.Ct. at 650. The Court, however, indicated that since defensive collateral estoppel provides a plaintiff

with incentives to join all defendants in the first action while offensive use of estoppel does not, the Court felt that the latter should be viewed differently:

> We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.* at 331, 99 S.Ct. at 651-52. In sum, with respect to its defensive use, the doctrine of mutuality of estoppel is defunct: with respect to its offensive use, its application is left to the discretion of the court.

The Claimants contend that "MADURO's argument rests expressly on the 'personification of the ship' theory, i.e., that the ship is a separate 'entity' and a lawsuit *in rem* against the ship is not barred by an *in personam* lawsuit against the owner." Claimants' Reply to Maduro's Memorandum of Law in Opposition to Claimants' Motion for Summary Judgment at Page 2. They then seek to bolster their position by citing commentators and courts that have reevaluated and ultimately discredited the "personification" theory. In light of *Blonder-Tongue* in which a plaintiff was estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant and in light of *Parklane* in which the Court abandoned the mutuality doctrine, this Court declines to become entangled in the academic question of the continued vitality of the personification theory or to determine whether the atavistic notion[1] of a ship's personality

1. The fiction relied upon has not been without its critics even in the field it was designed to serve. It has been referred to as 'archaic,' 'an animistic survival from remote times,' 'irrational' and 'atavistic.' Perhaps this is going too far since the fiction is one that certainly had real cause for its existence in its context and in the day and generation in which it was created. A purpose of the fiction, among others, has been to allow actions against ships where a person owning the ship could not be reached, and it can be very useful for this purpose still. *Continental Grain Co. v. Barge FLB-585, et al.,* 364 U.S. 19, 23, 80 S.Ct. 1470, 1473, 4 L.Ed.2d 1540 (1960).

holds up against the assertion of *res judicata* and collateral estoppel.

Further, this Court is aware that other courts have found a dismissal on the merits of an *in personam* suit in admiralty to be a bar to maintaining an action *in rem,* and vice versa. In *Burns Bros. v. The Central R.R. of New Jersey,* 202 F.2d 910 (2d Cir. 1953), Judge Learned Hand rejected the argument that since *in rem* and *in personam* actions involve different parties, *res judicata* does not apply from an *in personam* action against an owner to an *in rem* action against the ship. In so doing, he stated:

> The reason behind the doctrine of *res judicata* is that when a party to a controversy has had one fair chance to be heard, there is no reason to suppose that the result of a second trial will be more just than the first; and it is always true that interest *reipublicae ut finis litium.* Disputes arise between human beings, not inanimate things; and it would be absurd to give the beaten party another chance because on second trial he appears as the claimant to a vessel that is, and can be, nothing but the measure of his stake in the controversy.

*Id.* at 913.[2] *See also Continental Grain Co. v. Barge, FBL–585,* 364 U.S. 19, 25–27, 80 U.S. 1470, 1474–1475, 4 L.Ed.2d 1540 (1960); *Simon v. M/V Hialeah,* 431 F.2d 867 (5th Cir.1970). This Court does not, however, find the Plaintiff's distinction between cases sounding in tort and between those concerning an indebtedness to be meaningful or determinative. Not only do both maritime actions give rise to *in personam* and *in rem* remedies, but the reasoning behind the courts' election to find *res judicata* to be a bar is not narrowly confined to the realm of personal injury claims.

In *Baltimore Steamship Company et al. v. Phillips,* 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927), the Court set forth the pivotal question before a court faced with the assertion of *res judicata:*

The effect of a judgment or decree as *res judicata* depends upon whether the second action or suit is upon the same or a different cause of action. If upon the same cause of action, the judgment or decree upon the merits in the first case is an absolute bar to the subsequent action or suit between the same parties or those in privity with them, not only in respect of every matter which was actually offered and received to sustain the demand, but also as to every ground of recovery which might have been presented.

*Id.* 274 U.S. at 319, 47 S.Ct. at 602.

This Court is persuaded that the cause of action plead in the Complaint before this Court, in MADURO II, is the identical cause of action plead in the case already tried before Judge Davis in MADURO I. MADURO I sought recovery on the Plaintiff's claim for services rendered to three Naviera Gorbea vessels, one of which was the M/V Antonio de Gastenata. In MADURO II, the Plaintiff seeks to recover $148,000 in an *in rem* action against the M/V Antonio de Gastenata for a portion of the same claims that have been litigated in MADURO I. Moreover, this Court has employed the "same evidence test," *see Engelhardt v. Bell Howell Co.,* 327 F.2d 30 (8th Cir.1964), and finds that the evidence submitted in MADURO I is identical to the evidence to be submitted in MADURO II. In MADURO I invoices were introduced in evidence that purported to show services rendered to the M/V Antonio de Gastaneta. Maduro agrees that these invoices will be utilized as evidence in MADURO II. *See* Plaintiff's Response to Claimants' Local 10(J)(2) Statement of Facts at ¶ 16.

In sum, since this Court is of the opinion that the cause of action alleged in MADURO I is identical to the cause of action alleged in MADURO II and that the evidence in both actions is the same, under the doctrine of *res judicata,* the Judgment in the *in personam* suit in MADURO I oper-

---

**2.** In *Burns Brothers,* the Court found that the remedy *in rem* was not 'available' to Burns Brothers, and for that reason alone, the decree in the first suit was not a bar. This exception to the rule, however, is not applicable to the matter *sub judice* because the *in rem* action was not only available to Maduro, but also actually sought in MADURO II.

ates as an absolute bar to the subsequent *in rem* suit filed in this Court.

### III

### COLLATERAL ESTOPPEL

The Claimants herein have posited a second argument in support of their Motion for Summary Judgment. They contend that even if this Court determines that MADURO I and MADURO II are based on different causes of action, the prior adjudication in MADURO I operates as an estoppel in MADURO II to the subject claim. Since this Court has determined above that MADURO I and II are based on the same cause of action, there is no pressing necessity to engage in an in-depth analysis of whether the doctrine of collateral estoppel bars the claim for services rendered to the M/V Antonio de Gastaneta. This Court, however, declines to remain silent in this regard and will thus, briefly express its view that Maduro's claim for a maritime lien for services rendered to the ship was fully litigated and determined in the suit before Judge Davis.

■ The matter *sub judice* does satisfy the requirements for the application of collateral estoppel: one, the fact or issue is identical in both actions; two, the fact or issue was fully litigated in the prior action; and three, the determination of the fact or issue was essential to the resulting judgment in the prior action. *See Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198 (5th Cir.1981). In MADURO I, the jury was charged with determining whether or not there was a breach of contract to pay for services rendered. The jury found against Maduro on its claim against Gorbea for breach of the alleged agreement or promissory note in connection with stevedoring and other marine necessaries and supplies that Maduro allegedly furnished to the vessels. *See* Jury Verdict, Exhibit 15, Appendix B. The Jury also considered the identical affirmative defenses that have been raised in the instant suit.

The Joint Pre-Trial Stipulation submitted in MADURO I apprises this Court of what issues of fact and law were tried. *See* Exhibit 12, Appendix B. This Court has also reviewed the Joint Pre-Trial Stipulation filed in the *in rem* action and finds that it is substantially duplicative of its *in personam* predecessor. Such a Comparison leaves this Court with the impression that the Plaintiff herein is indeed endeavoring to re-open the already adjudicated question of whether it is entitled to recover for services rendered to one of the vessels. Even if this Court had not found the above, that MADURO I and II were based on the same cause of action, this Court would not allow MADURO to avail itself of a second opportunity to litigate issues that were already determined in a prior suit.

The Court in *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) discusses the erosion of the mutuality requirement and underscores some of the very interests behind the goal of limiting the relitigation of issues:

> In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or "a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure." *Kerotest Mfg. Co. v. C–O–Two Co.*, 342 U.S. 180, 185 [72 S.Ct. 219, 222, 96 L.Ed. 200] (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases,

the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard.

*Id.* 402 U.S. at 329, 91 S.Ct. at 1443.

This Court has considered the underpinnings of the doctrines of *res judicata* and collateral estoppel: the interest in the finality of litigation, in the prevention of harassment of parties, and in the promotion of efficient judicial administration. This Court is also aware of the deficiencies these doctrines aim to alleviate: the overcrowded dockets, the long delays prior to trial, and the increasingly prohibitive costs of litigation in general.

But these broader problems and policies behind the goal of limiting the relitigation of issues are not the only concerns that have prompted this Court to conclude that this Plaintiff who has already had a full and fair opportunity to prove a claim and has failed in this regard should be precluded from trying the merits of this suit a second time. This Court has also envisioned the actual repercussions of a decision to the contrary and the concrete effect of allowing such a second suit to proceed. These Claimants have indicated to this Court their intention to file a Motion to Admit the Trial Transcript. This Court has examined the Transcript of the Trial of MADURO I before Judge Davis which has been filed as Exhibit 1 to Appendix A in Support of this Motion for Summary Judgment. This Court is of the view that a decision in MADURO II could theoretically be based on a meticulous reading of this Transcript. Such an impression not only augurs in favor of the application of the doctrines of *res judicata* and collateral estoppel, but also admonishes this Court not to attempt to sit as an appellate tribunal to review the record of a case tried by one its brethren.

### IV

### CONCLUSION

In conclusion, this Court has reviewed the Claimants' Motion for Summary Judgment and finds that the claim presented in MADURO II is barred under either the doctrine of *res judicata* or collateral estoppel. Therefore, it is hereby,

ORDERED AND ADJUDGED that the Claimants, BANCO de CREDITO INDUSTRIAL, S.A. and SOCIEDAD de GESTION de BUQUES, S.A., are entitled to the Entry of Summary Judgment in their favor. The Claimants are directed to file with this Court within ten (10) days from the date of the entry of this Order a Final Judgment in accordance with the same.