UNITED STATES of America, Plaintiff,

v.

REPUBLIC MARINE, INC., and Conti-carriers and Terminals, Inc., In Personam, and M/V C.R. CLEMENTS, BARGE CCT 124, BARGE CCT 130, BARGE CNG 48B, BARGE GNC 265, BARGE SG 106, and BARGE DK 103, In Rem, Defendants.

CONTICARRIERS AND TERMINALS, INC., Defendant/Third Party Plaintiff,

v.

DRAVO CORPORATION, Third Party Defendant.

No. 85–4148.

United States District Court, C.D. Illinois, Rock Island Division.

Feb. 10, 1986.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for plaintiff.

Thomas N. Kamp, Davenport, Iowa and E. Spivey Gault, Greenville, Miss., for Republic.

Michael A. Snyder, Chicago, Ill., for Conticarriers.

Greg A. Egbers, Davenport, Iowa, for Dravo.

## MEMORANDUM OPINION
## AND ORDER

MIHM, District Judge.

This case involves a suit brought by the United States for damage to the wall of a lock on the Mississippi River. The case presents some issues that are matters of admiralty law, as well as legal issues regarding the meaning and scope of a number of United States statutes. The Court held a bench trial on October 16, 1985, and

the following are the Court's findings of fact and conclusions of law.

On August 17, 1979, the M/V C.R. Clements was pushing a tow of 15 empty grain barges up the Mississippi River. The M/V C.R. Clements is owned and operated by the Defendant, Republic Marine, and at that time was under the command of Pilot Omar Keel. The tow was arranged in three strings of five barges each, and the complete tow measured approximately 105 feet wide by 975 feet long. The tow boat was faced up to the last barge in the center. Barge CCT–124 was the stern-most barge in the starboard (right) string. The Defendant, ContiCarriers and Terminals, Inc., is the owner of barge CCT–124 for purposes of this suit, because it had bare-boat chartered the barge from its owner, Republic National Leasing Corporation.

As part of its trip upriver, the tow boat and its barges had to navigate through Lock and Dam Number 21, located on the Mississippi River near Quincy, Illinois. Lock and Dam Number 21 was built in 1939 by the United States Army Corps of Engineers, which has operated the facility since its construction. Lock and Dam Number 21 was built by the Plaintiff, the United States of America, for the preservation and improvement of the navigable waters of this nation.

Because the lock chamber at Lock 21 is only 600 feet long by 110 feet wide, the tow boat had to divide the tow into two separate "cuts" of barges in order to pass through the lock. The tow boat and its barges approached the lock shortly after noon on August 17, 1979. At that time the lock was being operated by lockmen Jerome Peter and Leonard Whipps, who directed the procedures for entering and exiting the lock. The M/V C.R. Clements pushed the forward nine barges of its tow into the lock chamber of Lock 21 and this first cut of barges passed through the lock without incident and caused no damage to the lock.

Following the lockage of the first cut, the lockmen reduced the water level in the lock so that the second cut of barges and the tow boat could enter. The second cut consisted of six barges, two long and three wide, and the M/V C.R. Clements itself.

Prior to the second cut entering the lock, the barges and the tow boat lay along the downstream guide wall of the lock, located on the Illinois side of the lock facility. As the lock employees lowered the water level in the lock chamber, the turbulence caused the boat and its tow to swing out at a slight angle from the guide wall. Lockman Jerome Peter advised Captain Keel that his stern was too wide, and that he would have to get closer to the east (Illinois) wall before he could enter the lock. Lockman Peter also advised the Captain to keep the starboard side of his tow close to the east side of the lock because repairs were being made to the concrete structure on the west side of the lock opening. Captain Keel complied with these orders, and in doing so the starboard side of his tow came into contact with the east guide wall at a point downriver from where the lock wall was subsequently damaged.

The lock gate is hinged in a recess in the wall of the lock chamber in such a way that when fully opened, the gate, lying within the recess, forms a flush surface along which the tows can be pushed. The vertical outside corner formed by the lock wall and the downstream end of the gate is protected by a steel angle called an armor plate, designed to protect the concrete corner of the lock wall. The armor plate is approximately 15 feet long, with each side of the plate approximately six inches in width and about ¾ inch thick. The armor plate is set into the concrete corner of the lock wall in such a manner so as to present a flush surface with the wall and protect the edge of the concrete wall from damage when barges rub against it.

The Barge CCT–124 is 35 feet wide, 200 feet long, and 12 feet deep. Fitted to each side, approximately 23 inches below the deck were three rub bars, one near each end of the barge and one mid-ship. The rub bar is a ¾ inch thick steel plate, extending about eight inches high and 36 inches forward and aft. The rub bar acts as a buffer to prevent damage to the wall

of the barge when it comes into contact with anything.[1]

As the tow boat pushed the second cut of barges into the lock, Captain Keel kept the starboard side of the tow sliding along the east wall of the lock. The lock chamber is 110 feet wide, only five feet wider than the tow being pushed by M/V C.R. Clements. In order to enter the lock, the tow had to be lined up almost exactly straight with the entrance of the lock chamber, and the best way for the tow to stay away from the west side of the lock was to slide along the east wall of the lock chamber.

While the tow boat pushed the second section of barges into the lock, Barge CCT–124 caught on the armor plate and pulled loose from the wall both the armor plate and some attached concrete. The United States Army Corps of Engineers made emergency repairs to the corner of the lock wall immediately after the collision. The Corps began the major repair work in January, 1980, and completed the repairs in February, 1980, restoring the armor plate and surrounding concrete work to its original condition. The total cost of the repairs was $29,974.41, including $1,906.67 for administrative overhead.

Following the incident, Captain Keel observed two burrs extending from the edge of the protection angle and fresh scratch marks on the side of the barge which had apparently been made when the rub bar passed up against the burrs on the protection angle. The cause of these burrs is unknown and it is also unknown as to how long these burrs had been present on the angle iron at the corner of the lock wall prior to the accident. The evidence does not establish how far these burrs extended from the plate into the lock chamber, but they were not particularly discernible in the absence of a minute inspection.

The United States brought suit against the M/V C.R. Clements, *in rem*, Barge CCT–124, *in rem*, Republic Marine, Inc., as owner of the tow boat, *in personam*, and ContiCarriers and Terminals, Inc., as owner of the barge, *in personam*, pursuant to 33 U.S.C. §§ 408 and 412. The United States also brought an action premised upon negligence, but the Government dismissed that cause of action at the commencement of the trial.

Republic Marine, Inc. filed a cross-claim against ContiCarriers for indemnity and contribution, alleging that Barge CCT–124 was unseaworthy and that ContiCarriers breached its warranty of seaworthiness to the tow boat operator. ContiCarriers filed a cross-claim against Republic Marine and brought a third party action against Dravo Corporation, the shipbuilder which constructed Barge CCT–124, alleging that the barge was unseaworthy and its unseaworthy condition caused the damages sued for by the Government.

This case presents some difficult questions for the Court, because it raises issues involving strict liability, contributory negligence, and causation. While the case law on these matters is somewhat helpful, none of the cases really address the particular situation with which the Court is presented in this case.

---

1. A dispute exists in this case as to the condition of the edge of the barge's rub plate at the time of the collision. One of the lockmen testified that the edge of the rub plate was a straight edge, not filled in. Captain Keel, in his deposition, however, testified that he had investigated the rub plate at the time of the accident and that its edge was beveled (filled in to make an angled edge). The Defendant's expert testified that when he inspected the barge prior to trial, almost six years after the accident, the edges around the rub plates were filled in and ground down and it appeared from the quality of the weld that the rub plates were in the same condition they would have been in when the barge was manufactured.

There is no other evidence to support the suggestion that the rub bar had a sharp corner or defective edge sticking out at the time of the accident. The Court concludes that the preponderance of the evidence indicates that the rub plates on the Barge CCT–124 had beveled edges at the time of the collision with the armor plate on the lock wall. The Court also finds that the Barge and its rub plate were not defective and that, in light of the lockman's testimony that barges with both beveled (filled in) and straight (non-beveled) rub plates pass through the lock without incident, the issue of whether the Barge was defective or not was not determined by the type of edges it has on its rub plates.

The statutes under which the Government brings suit are sections of the Rivers and Harbors Act of 1899, which has been modified slightly since its passage. Section 408 of Title 33 U.S.C. states:

"It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works."

The penalties for violating this statute are described in 33 U.S.C. §§ 411 and 412. According to § 411:

"Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this Title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than 30 days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction."

Section 412 establishes the liability of masters, pilots, and engineers on board vessels which violate provisions of the Rivers and Harbors Act. Section 412 then goes on to state:

"[A]ny boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

The case law in this circuit and in others has clearly established that the standard of care imposed by 33 U.S.C. §§ 408 and 412 is strict liability. *United States v. Central Soya, Inc.,* 697 F.2d 165 (7th Cir.1982); *United States v. Logan & Craig Charter Service,* 676 F.2d 1216 (8th Cir.1982); *United States v. Ohio Valley,* 510 F.2d 1184 (7th Cir.1975); *United States v. Tug Colette Malloy,* 507 F.2d 1019 (5th Cir.1975); *United States v. M/V Martin,* 313 F.2d 851 (7th Cir.1963). According to the Seventh Circuit in *Ohio Valley Company, Inc.:*

"It has been consistently held that in actions brought by the United States pursuant to 33 U.S.C. §§ 408, 412 there is no requirement that negligence be shown and that a defendant vessel is liable if it has been the cause of a violation of 33 U.S.C. § 408.... [T]he purpose of the combined effect of sections 14 and 16 [of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 408, 412] is to provide funds for the replacement and maintenance of improvements built by the United States. This purpose is implemented by an absolute liability standard." 510 F.2d at 1186, 1188.

■ The area of strict liability law is undergoing constant change and development in today's world, especially in the area of products liability law. These changes have been prompted by developments in negligence law in general and in the concepts of negligence defenses and comparative fault in particular. The Defendants in this case have asked the Court to reduce the impact of using a strict liability standard by applying comparative fault

principles to the facts of this case. However, the Court has not been able to find any cases which have applied the doctrine of comparative fault to the strict liability standard set forth in the statutory cause of action for damage to navigational facilities under 33 U.S.C. §§ 408 and 412. The Court declines to adopt the approach suggested by the Defendants and finds that the above-cited statutes impose a standard of strict liability.

Nevertheless, the Court does reaffirm the principle that even under the strict liability standard of §§ 408 and 412, the Government must prove that the Defendants caused the damage in order to prevail. As explained by the Fifth Circuit in *United States v. Tug Colette Malloy*, 507 F.2d 1019 (5th Cir.1975):

"[I]f the tug had shown the gateman to be solely at fault in causing the accident a defense would have been established. (Citation omitted). Here the evidence of the tug's own causal contributions to the accident negates the possibility of a sole cause defense. That concluded, whether the United States was in no way negligent or contributorily negligent is immaterial. Garden-variety contributory negligence is not ordinarily deemed a defense to strict liability, and we do not believe that such fault should be a defense in this strict liability admiralty suit." 507 F.2d at 1022.

Thus, the Court must reach a conclusion about the *cause* of the damage to the lock in the context of this strict liability suit in admiralty.

There are a number of cases which bear on this issue and show how courts have interpreted these principles in light of the facts before them. In *United States v. The Republic No. 2*, 64 F.Supp. 373 (S.D. Tex.1946), the court held that the *in rem* defendants, Tug Republic No. 2 and three barges, were liable for damages caused to the guidewalls of the flood gates on the intercoastal waterway and the Brazos River in Texas and pecuniary penalties under 33 U.S.C. §§ 408, 411, and 412. The court expressly found that the accidents complained of could not reasonably have been avoided by the ship, but nevertheless found the defendants liable because the statute attached a penalty without regard to willfulness, intent, mistake, or innocence.

*United States v. Tug Colette Malloy*, 507 F.2d 1019 (5th Cir.1975), involved damage to the flood gates on the Brazos River caused by a collision between the barge towed by the Tug Colette Malloy and the closed flood gates. The Fifth Circuit pointed out that the statutes under which the Government brought suit, 33 U.S.C. §§ 408 and 412, impose a standard of strict liability. Nevertheless, the district court found, and the Fifth Circuit affirmed, that the gateman had failed to open the flood gates when he should have, that the lookout on the bow of the barge did not have an adequate means of communicating with the wheelhouse of the tow boat, and that the Tug Colette Malloy had failed to give sound signals when approaching the flood gate as required by regulation. The Fifth Circuit indicated that these findings were relevant to the issue of the defendant's claim that the actions of the flood gate employee constituted a sole cause defense.

In discussing the possibility of a sole cause defense, the Fifth Circuit concluded that the tug boat's failure to comply with regulations regarding sound signals and adequate communication contributed to the collision. Once the court concluded that the tug's own causal contributions to the accident had negated the possibility of a sole cause defense, the court went on to say that contributory negligence is not ordinarily a defense to strict liability. Therefore, concluded the court, it was immaterial whether the United States was negligent or not. After finding the defendant vessels liable under the statute, the court then refused to require the United States to imdemnify the defendants because "indemnification would undermine the strict liability imposed by the statutes." 507 F.2d at 1023.

The Court finds this opinion confusing because of what it says and does not say on the issue of causation in a strict liability suit. The Fifth Circuit said that the defendants would have made out a good de-

fense if they had proved that the gateman was the sole cause of the accident. Then the court discussed the tug boat's failure to comply with sound and communication regulations and concluded that the tug had causally contributed to the collision. The Fifth Circuit pointed out that the proper standard for the case was strict liability and that the Government's negligence was immaterial, but then the court proceeded to discuss the "causal contributions" of the tug and its crew in a manner that brings to mind the idea of fault. As this Court understands it, fault is not an element of a strict liability suit, so the Court is confused as to why the Fifth Circuit found it necessary to rely upon the district court's findings that the tug boat had not given proper sound signals and that its crew members were not in proper contact with the wheelhouse. Although the Fifth Circuit speaks in terms of "causal contributions" rather than "fault," the opinion in *Tug Colette Malloy* does suggest that the court found for the Government and against the defendants because the Government had established the elements of the defendants' fault at trial.

The Eighth Circuit handled this matter of causation in a much more straight-forward manner in a case which very closely resembles the present case. In *United States v. Logan & Craig Charter Service*, 676 F.2d 1216 (8th Cir.1982), the United States sued *in rem* the M/V Margie Logan and nine barges, and *in personam* Logan & Craig, the owner and operator of the tow boat under 33 U.S.C. §§ 408, 411, and 412 for damage to a lock extension. At the particular lock which was damaged, the Army Corps of Engineers had extended the guidewalls leading to the lock chamber by annexing three barges to the guidewall and anchoring them to the river bottom. The collision occurred when the corner of the lead barge contacted a corner of one of the anchored barges which was not aligned with the adjacent barge and protruded four to six inches into the channel. The district court found that the M/V Margie Logan's approach was consistent with customary procedures and was accomplished in a prudent and seamanlike manner. It also found that this misalignment condition created an unlawful obstruction to navigation under 33 U.S.C. § 403. The district court entered judgment for the defendants, holding that the Government violated its duty to correct a hazard or warn navigators and that this negligence was the sole proximate cause of the collision.

The Eighth Circuit reversed the lower court's decision, pointing out that the misalignment could not separately be characterized as a § 403 obstruction because the district court should have considered the lock structure as a whole. The circuit court then stated that the barge extension of the guidewall was a work protected under § 408 and indicated that §§ 408 and 412 impose strict liability and do not require a showing of negligence. The Eighth Circuit then concluded, "[T]he sole issue is causation. The M/V Margie Logan was clearly an active cause of the damage at issue." 676 F.2d at 1220. The Eighth Circuit held in favor of the Government on the issue of liability and remanded the case to the district court to determine damages.

■ Similarly, in the present case, the evidence shows that the M/V C.R. Clements approached Lock and Dam Number 21 in a prudent and seamanlike manner and Pilot Keel followed all the orders given by the lockmen. There was nothing negligent about the manner in which he approached and entered the lock chamber with the second cut of barges. However, as the cases point out, the standard for damages and penalties under §§ 408 and 412 is strict liability. Therefore, it is unnecessary for the Court to find negligence in order to find that the M/V C.R. Clements and its barges were an active cause of the collision, as indicated in *Logan & Craig Charter Services.*

At the same time, because the statute is a strict liability statute, the Court does not have to make an inquiry into whether the Government was negligent in maintaining Lock and Dam Number 21. The court in *Tug Colette Malloy* indicated that once the court concluded the defendant vessel had causally contributed to the accident, the

issue of the United States' negligence or contributory negligence was immaterial. The Eighth Circuit in *Logan & Craig* did not even mention the Government's conduct in misaligning the anchored barges once the court indicated that the tow boat was an active cause in the collision. These decisions lead this Court to conclude that the Defendants cannot escape liability under 33 U.S.C. § 408 and 412 by arguing that the Government was negligent in allowing a burr to exist which extended into a lock chamber from the armor plate. By coming into contact with the armor plate and its burrs, the M/V C.R. Clements and its barges became an active cause of the collision and the resulting damage to the armor plate and surrounding concrete. Even though the burr was a cause of the accident, the ship's involvement is clear. Something on the side of the barge contacted the burrs on the armor plate, and without this combination of factors the damage to the lock would not have occurred. Imposing liability on the Defendant vessels without regard to fault is consistent with the purposes of the statute as discussed by the Seventh Circuit in *United States v. Ohio Valley Company, Inc.*, 510 F.2d 1184, 1188 (7th Cir.1975). The Court concludes that liability runs in favor of the Government and must now address the issue of which Defendants are liable for what amount of damages.

This case is an admiralty case and involves the interesting admiralty practice of allowing ships themselves to be brought in as *in rem* defendants in particular types of suits. However, this practice complicates matters for the Court in deciding which Defendants are liable to the Government, because the Government has sued the tow boat and barge *in rem* and the owners of each of these vessels *in personam*. This case, then, presents the dual issues of whether the Government has followed the procedures necessary to bring an *in rem* action against the barge and the tow boat and whether, in addition to the *in rem* recovery expressly provided in § 412, §§ 408 and 412 allow for *in personam* recovery against the ship owners as well.

Turning to the first of these issues, the Court finds that it does have *in rem* jurisdiction over both Defendant vessels, the M/V C.R. Clements and Barge CCT–124. With regard to the M/V C.R. Clements, on June 8, 1983, New York Marine Managers, Inc., on behalf of Republic Marine, Inc., provided the Plaintiff with a letter of undertaking. A letter of undertaking has the same effect as if the vessel had been seized and released pursuant to a bond. *Continental Grain Co. v. Federal Barge Lines, Inc.*, 268 F.2d 240 (5th Cir. 1959), *aff'd.*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960). Moreover, the Court's *in rem* jurisdiction over the M/V C.R. Clements is not in dispute and has not been challenged by Republic Marine, who, in fact, answered the complaint *in personam* and *in rem* on behalf of M/V C.R. Clements.

The arguments surrounding the *in rem* jurisdiction over the Barge CCT–124 are not so easily resolved. ContiCarriers, in its proposed findings of fact and conclusions of law, suggests that because the Government never properly served process upon the barge, Barge CCT–124 is not within the jurisdiction of the Court as an *in rem* Defendant. The pleadings in this case do indicate that the barge never was seized as required by Rule C, Supplemental Rules for Admiralty and Maritime Claims, nor did ContiCarriers provide the Government with a bond or letter of undertaking. Nevertheless, although ContiCarriers may have had a valid objection to *in rem* jurisdiction over Barge CCT–124, ContiCarriers has lost the opportunity to avail itself of that defense on behalf of the barge.

The pleadings in the case show that the Government's complaint was clearly framed as an *in personam* action against ContiCarriers and an *in rem* action against Barge CCT–124, which, the Government alleged, was owned by ContiCarriers. ContiCarriers answered this complaint by denying liability and by denying ownership of Barge CCT–124, even though it admitted that ContiCarriers and the barge would be within the district during the pendency of the litigation. Later, ContiCarriers did re-

spond to Republic Marine's cross-claim as an *in personam* Defendant and as the claimant to Barge CCT–124, *in rem.* Finally, the parties filed a stipulation prior to trial that at the time of the accident, Barge CCT–124 was bare-boat chartered to Conti-Carriers by Republic National Leasing Corporation, and ContiCarriers became owners for purposes of this litigation. At no time prior to filing its proposed findings of fact and conclusions of law did ContiCarriers ever object to the *in rem* jurisdiction over Barge CCT–124 or bring a motion to dismiss for lack of jurisdiction over the Defendant barge.

The Court concludes that these facts are sufficient to give the Court *in rem* jurisdiction over Barge CCT–124 even though the barge was never actually seized pursuant to service of summons and complaint. The Fifth Circuit in *Cactus Pipe & Supply v. M/V Montmarte,* 756 F.2d 1103 (5th Cir. 1985), indicated that a court could have *in rem* jurisdiction over a defendant vessel even without *in rem* service of process. The court began its analysis by indicating that a party can waive *in personam* jurisdiction by failing to raise it in a motion under Rule 12 of the Federal Rules of Civil Procedure or not including it in a responsive pleading. The court also pointed out that generally, an appearance in an action involved some presentation or submission to the court. *Id.* at 1107–08. The court held that because the vessel's owner had filed a claim of ownership without raising any objection to jurisdiction, the *in rem* jurisdiction of the district court was perfected. *Id.* at 1110.

Although the situation before the court in *Cactus Pipe* was somewhat different than that of the present case, this Court does not believe that those differences are enough to require this Court to reach a contrary conclusion. Even though Conti-Carriers never filed a formal claim of ownership which stated the owner's interest in the vessel and demanded restitution and a right to defend it (as did the vessel owner in *Cactus Pipe* ), ContiCarriers' actions in this litigation were such that it is not unfair for the Court to treat ContiCarriers as having asserted its interest in the vessel

and its right to defend it. Moreover, during the entire pretrial proceedings and even during the trial itself, ContiCarriers never objected to the Court's jurisdiction or indicated that it was not representing or defending the *in rem* Defendant barge. Because these actions of ContiCarriers are inconsistent with ContiCarriers' later objection to *in rem* jurisdiction, the Court finds that it does have *in rem* jurisdiction over Barge CCT–124.

▇ Turning to the question of the Government's *in personam* actions over the owners of the *in rem* Defendants, the Court finds itself facing unclear statutes and a confused state of the law. Contrary to the assertions of the parties, it is by no means clear to the Court that an *in personam* action exists in favor of the government against owners of vessels which cause damage to government works under 33 U.S.C. § 408. The cases cited by the parties on this issue are not particularly enlightening because these cases do not point out which Defendant or Defendants the Court is holding liable under the strict liability standard of 33 U.S.C. §§ 408 and 412. In fact, in one of these cases, *United States v. Federal Barge Lines,* 573 F.2d 993, 998 (8th Cir.1978), the court went on to expressly state that it was not addressing the question of whether *in personam* relief was available under § 408 in addition to the *in rem* remedy expressly provided by § 412. Likewise, in *United States v. Ohio Valley Company, Inc.,* 510 F.2d 1184 (7th Cir.1985), the court disposed of the case on the basis of count II, which was a claim asserted against the defendant vessel under §§ 408 and 412 and did not name the vessel's owner as a defendant.

The difficulty this Court has in determining whether an *in personam* action lies against the owner of a vessel involved in a violation of § 408 results from the wording of the provisions of the Rivers and Harbors Act of 1899. Section 408 makes it unlawful for any person to injure any work of the United States for use in navigation, § 411 imposes penalties upon persons and corporations which violate or knowingly aid a

violation of § 408, and § 412 imposes liability upon vessels used or employed in violating § 408 and sets a standard of liability for masters and pilots on board such vessels. Nowhere in the statute is the *in personam* liability of the owner of such a vessel addressed if the owner were not on board or did not personally do any of the acts prohibited in § 408.

The Seventh Circuit gave some indication of how it interprets these statutes in the case of *United States v. Ohio Valley Company, Inc.*, 510 F.2d 1184 (7th Cir.1975). In discussing whether the Limited Liability Act of 1851, 46 U.S.C. § 183(a), applies to suits brought by the United States pursuant to 33 U.S.C. §§ 408 and 412, the court said:

"Sections 14 and 16 [of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 408 and 412] speak in terms of a vessel being liable for the damages caused to a United States work. Thus, the United States must proceed *in rem* under section 14 and the relevant part of section 16. Indeed, the government at oral argument admitted that there could be no *in personam* liability under its Count II. In an *in rem* proceeding where amounts claimed in excess of the value of the res seized cannot be levied upon, the judgment for all practical purposes will always be limited to the value of the res which will generally be the value of the ship plus cargo. The *in rem* liability of section 16 for an action brought pursuant to sections 14 and 16 is not amenable to section 183(a) limitation which refers only to limiting the *in personam* liability of an owner of a vessel." (Footnotes omitted). *Id.* at 1188–89.

The Supreme Court's decision in *Wyandotte Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), also puts forth an analysis useful in the present situation, even if the facts of the two cases are different. In *Wyandotte*, the Supreme Court held that the United States may assert *in personam* rights against persons responsible for the negligent sinking of a vessel in order to recover monies expended by the Government for removal of those sunken ships. The ship owners, Wyan-

dotte, sought to limit their liability to the value of the ship and its cargo, which the Government had recovered and sold following Wyandotte's abandonment of the wreck. The controlling statute in *Wyandotte* was 33 U.S.C. § 409, which prohibits the voluntary or careless sinking of vessels and imposes certain duties upon the owners to mark and remove a vessel whenever a vessel is wrecked and sunk in a navigable channel. The Supreme Court read this statute, along with 33 U.S.C. §§ 414 and 415, as imposing a limit upon the liability of a vessel owner to the value of his ship and cargo only when such owner has abandoned his sunken vessel and was not negligent in its sinking. In instances in which the owner is negligent, held the Court, the government may proceed *in personam* against the owner for injunctive relief and for removal costs in excess of the value of the sunken vessel.

Although the present case involves different sections of the Rivers and Harbors Act of 1899, the decision in *Wyandotte* suggests the analysis to be used by this Court in interpreting this statute. In *Wyandotte*, the Supreme Court held that ship owners who negligently sink a vessel are liable *in personam* for removal costs, thereby acknowledging that owners would be limited in their liability to the extent of the value of their ship if the ship were sunk non-negligently. Similarly, § 412 authorizes the Government to proceed *in rem* against a vessel involved in violating § 408, and the standard in such an action is strict liability. In light of the implications of *Wyandotte* and in the face of a statute which imposes liability without fault or negligence, the Court is reluctant to hold ship owners liable for damages beyond the value of their ships under 33 U.S.C. §§ 408 and 412. Therefore, the Court agrees with the point conceded by the Government in *Ohio Valley Company* and holds that no *in personam* cause of action lies against ContiCarriers and Marine Republic as owners of the *in rem* Defendant vessels, Barge CCT–124 and the M/V C.R. Clements.

As for the amount of damages for which the *in rem* Defendants are liable, the Court holds that the Government has proven it is entitled to recover damages in the amount of $29,974.41. This award includes an amount for overhead, which is an authorized recovery expense when the government agency does its own repair work. *United States v. Peavey Barge Line,* 748 F.2d 395, 399–400 (7th Cir.1984). The damage award also reflects additional costs which resulted from the Government's delay in repairing the lockwall. The Court concludes that these charges are reasonable because there is no indication that the Government's decision when to repair the lock, in view of the volume of traffic on the river, was arbitrary or capricious. The Government is also entitled to pre-judgment interest from the date of the collision in the amount of 11%.

The Defendants have argued to the Court that the damages claimed by the Government are unreasonable in that the repair work actually improved the condition of the lock wall rather than just restoring it to its pre-collision condition. The Court concludes that the evidence does not permit any type of reasoned estimate as to the condition of the lock wall prior to the collision which might have been caused by water seepage. Therefore, the Court declines to speculate on this matter and holds that the Government may recover the entire amount of damages it is seeking.

The Court dismisses the cross-claims and third party complaint on the merits because the evidence shows that neither the Barge CCT–124 nor the M/V C.R. Clements was defective or unseaworthy.

Finally, the Court has discretion under 33 U.S.C. §§ 411 and 412 to set pecuniary penalties against the Defendant vessels in an amount between $500 and $2,500. In assessing this penalty, the Court points out that neither vessel was operated negligently or improperly, and there was no way the Defendants could have avoided the accident short of avoiding traveling through the lock. The Court assesses a penalty against each Defendant vessel in the amount of $500.

The Court does not like the result reached in this case, but it believes it has no choice but to hold the Defendant vessels liable for damages. The Court understands the purpose and public interest involved in a statute of this type. Nevertheless, holding a Defendant strictly liable for damages when, but for the protrusion of the burrs into the lock chamber, the accident would not have happened, results in a manifest injustice. The Court, however, is bound by the law as announced by the Seventh Circuit, and that law makes it clear that the standard of liability for defendant vessels under 33 U.S.C. §§ 408 and 412 is strict liability and fault or negligence is immaterial under this standard.

The Court orders that the *in rem* Defendants, the M/V C.R. Clements and the Barge CCT–124, are jointly and severally liable to the United States for damages in the amount of $29,974.41 plus interest in the amount of 11%. The Court further orders the Defendants to pay a penalty in the amount of $500 each.