The **BOSTON AND MAINE CORPORATION; Delaware & Hudson Railway Company; Maine Central Railroad Company; and Portland Terminal Company, Plaintiffs,**

v.

**UNITED TRANSPORTATION UNION; Sheetmetal Workers International Association; Brotherhood of Railroad Signalmen; Brotherhood of Railway Carmen; Brotherhood of Locomotive Engineers; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; Brotherhood of Railway, Airline & Steamship Clerks; International Brotherhood of Firemen and Oilers; International Association of Machinists; and International Brotherhood of Electrical Workers, Defendants.**

Civ. A. No. 86–1327–W.

United States District Court,
D. Massachusetts.

May 5, 1986.

Ralph J. Moore, Jr., Shea & Garner, Washington, D.C., for plaintiffs.

James F. Freeley, Robert T. Naumes, Paul Kelly, Boston, Mass., Thomas P. Murphy, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

This is an action arising under the Railway Labor Act, 45 U.S.C. §§ 151–188. The plaintiffs are related railroad companies (the "Railroads"). The defendants are unions (the "Unions"). The Unions have been honoring the picketing of the Railroads being conducted by a sister union. On April 21, 1986, the Railroads sent a notice to members of the Unions which resulted in a strike by the Unions on April 25, 1986. The strike, among other things, shut down commuter rail service in Greater Boston. On April 26, 1986, this action was filed, seeking to enjoin that strike. On that day, the court (Keeton, D.J.) issued a temporary restraining order, suspending implementation of the actions announced in the April 21, 1986 notice, thus removing the cause of the strike and enjoining continuation of the strike during the pendency of that order. (Exhibit A hereto). On April 28, 1986, the Unions filed a motion to dismiss this case for failure to file a compulsory counterclaim or, alternatively, to dismiss, stay, or transfer the case to the District Court of Maine for consolidation with a related matter pending before Judge Gene Carter.

The action in the District Court of Maine began on March 24, 1986, more than a month before the filing of the complaint in this case. The proceedings in Maine raise the same claims and the same requests for relief that are involved in this case. In addition, litigation on the issues raised in the Railroads' motion for injunctive relief was commenced in the Maine action on April 24, 1986, two days before the Railroads filed their motion in this case.

As explained below, the motion to dismiss for failure to state a compulsory counterclaim is denied. This action will, however, be stayed to permit Judge Carter to

decide (1) whether parallel proceedings in Maine and Massachusetts are appropriate and, if not, (2) whether Maine or Massachusetts is the preferable forum for the consolidated actions. The need to decide the most appropriate venue for these matters constitutes good cause to continue the Temporary Restraining Order in this case, which is extended to May 16, 1986. The foregoing decisions are implemented by the Order set forth at the conclusion of this memorandum.

## I. FACTS AND PROCEDURAL HISTORY

Recitation of certain facts and procedural history is useful to put the Unions' motion to dismiss, stay, or transfer in context.

On March 3, 1986, the Brotherhood of Maintenance of Way Employees ("BMWE"), which is not a party in this case, began a strike against the Portland Terminal Company ("PTC"), a subsidiary of the Maine Central Railroad Company ("MEC"). The next day, BMWE began a strike against MEC as well. This dispute arose over the Railroads' proposed changes to rates of pay, rules, and working conditions. The strike was initiated after the National Mediation Board ("NMB") released the parties from mediation under § 5, First of the Railway Labor Act ("RLA"), 45 U.S.C. § 155, First. The strike covered all of the rail facilities of MEC and PTC in the New England area. This strike has precipitated a series of related legal actions in the federal courts.

MEC and PTC filed suit against BMWE in the District Court of Maine to enjoin the strike actions. *Maine Central Railroad Company and Portland Terminal Company v. The Brotherhood of Maintenance of Way Employees,* Civil Action No. 86–083–P ("the MEC/PTC case"). The case was assigned to United States District Judge Gene Carter. On March 5, 1986, Judge Carter denied plaintiffs' motion for a preliminary injunction. *See* Exhibit A to Memorandum in Support of Unions' Motion to Dismiss or in the Alternative to Stay or Transfer (the "Unions' Memorandum").

On March 6, 1986, the Boston and Maine Corporation ("B & M") filed a motion for a temporary restraining order in the District Court of Massachusetts seeking to prohibit the BMWE from extending its strike to B & M facilities, including the B & M's commuter rail facilities in Greater Boston. *Boston and Maine Corporation v. Brotherhood of Maintenance of Way Employees,* Civil Action No. 86–0785–S ("the B & M case"). Two hours later, the BMWE filed suit in the District Court of Maine, again before Judge Carter, seeking a declaratory judgment affirming its right to picket B & M facilities, as well as the facilities of the Delaware & Hudson Railway Company ("D & H"). *Brotherhood of Maintenance of Way Employees v. Boston and Maine Corporation and Delaware & Hudson Railway Company,* Civil Action No. 86–0084–P ("the B & M/D & H case"). BMWE also sought a declaration of their right to encourage employees of other unions to join in its strike or at least honor its picket lines. B & M withdrew its TRO motion in its case in the District Court for Massachusetts, which had been assigned to U.S. District Judge Walter J. Skinner, after the BMWE agreed that it would not picket B & M's commuter rail stations in the Boston area. Judge Skinner then transferred the case to the District Court of Maine, where it too was assigned to Judge Carter.

In another BMWE-related action, on March 10, 1986, the Massachusetts Bay Transportation Authority ("MBTA") filed suit in the District Court of Massachusetts against the BMWE to enjoin picketing of B & M commuter rail services in the Boston area.[1] *Massachusetts Bay Transportation Authority v. Brotherhood of Maintenance of Way Employees,* Civil Action No.

---

1. The MBTA is a political subdivision of the Commonwealth of Massachusetts that provides mass transportation service in 64 cities and towns throughout the state. It has a contract with B & M to provide commuter rail service on lines running out of North Station and South Station in Boston ("the North Shore line" and "South Shore line", respectively).

86–0826–K ("the MBTA case").[2] This case was assigned to U.S. District Judge Robert Keeton, but initially addressed by U.S. District Judge John McNaught in his capacity as Emergency Judge. On March 11, 1986, Judge McNaught denied the MBTA's motion for a temporary restraining order in reliance upon the BMWE's agreement that it would not picket, and therefore not shut down, any B & M facility devoted strictly to activities involving commuter rail services in the Boston area. *See* March 11, 1986 Memorandum on Denial of Injunctive Relief in Civil Action No. 86–0826–K, attached to Railroad's Memorandum in Support of Their Motion for a Preliminary Injunction. Later that day, the BMWE extended its picket lines to all B & M facilities in the New England area except those strictly devoted to commuter rail service for the Boston area.

On March 14, 1986, D & H obtained an *ex parte* temporary restraining order from the Supreme Court of New York in Albany, enjoining the BMWE from picketing D & H facilities. The BMWE removed the case to the District Court for the Northern District of New York. United States District Judge Howard Munson, to whom the case was assigned, denied D & H's motion for a preliminary injunction, holding that comity required the motion to be raised and decided by Judge Carter in the B & M/D & H case. *See* Exhibit F to Unions' Memorandum.

In response to Judge Munson's order, D & H filed a counterclaim for injunctive relief in the BMWE's action against B & M and D & H in the District Court of Maine before Judge Carter. Judge Carter denied D & H's motion to preliminarily enjoin the BMWE picketing on April 2, 1986. *See* Exhibit B to the Unions' Memorandum.

At this point, the BMWE was picketing all freight facilities of B & M, D & H, MEC, and PTC. Members of the Unions that are defendants in this action were

honoring the BMWE's picket lines. Consistent with representations to Judge Skinner in the B & M case and to Judge McNaught in the MBTA case, the BMWE picketing did not include facilities exclusively devoted to commuter rail service in the Boston area. However, the picketing did involve certain joint freight-commuter facilities, resulting in a diminution of commuter rail service to Boston, as described below.

On March 24, 1986, the Railway Labor Executives' Association ("RLEA"), an unincorporated association of chief executive officers of all the railway unions in the United States, brought suit in the District Court of Maine on behalf of its member organizations, including the defendant Unions, against B & M, D & H, MEC, PTC, and their parent corporation, Guilford Transportation Industries, Inc. ("Guilford"). *Railway Labor Executives' Association v. Guilford Transportation Industries, Inc.*, Civil Action No. 86–0122–P ("The Maine RLEA case"). This action was assigned to Judge Carter, who also had three BMWE cases before him. The Maine RLEA case, to which the BMWE is not a party, is an action for a declaratory judgment and injunctive relief, seeking in part to restrain the Railroads from discharging, replacing, making seniority adjustments, or threatening such actions, against Union employees who honor the BMWE picket lines. The RLEA also requests in that action that the court restrain the Railroads from making any changes in labor agreements with, or established practices concerning, the Unions without first obtaining court approval. The Railroads and Guilford filed an answer on April 16, 1986.

On April 21, 1986, the Railroads sent letters to all their employees honoring the BMWE picket lines, notifying them that they were expected to return to work by April 25, 1986. The notice further stated

---

2. Judge Keeton recently dismissed another action between BMWE and B & M for lack of subject matter jurisdiction. His decision was affirmed by the Court of Appeals for the First

Circuit. *Brotherhood of Locomotive Engineers v. Boston and Maine Corp.*, 788 F.2d 794 (1st Cir.1986).

that the Railroads would observe the seniority rights of Union members who returned to work, except that returning workers would not be able to displace junior employees who started working before March 4, and who had been reporting to work during the strike. The notice also announced that the assignments of those not reporting to work by April 21, 1986 would be filled by permanent replacements.

After sending the April 21, 1986 letter, the Railroads informed the Unions that the employees who did not return to work would not be discharged without possibility of reinstatement. Rather, if these employees eventually decided to return to work and no assignments were available, they would be placed on priority hiring lists, subject to the conditions stated in the April 21, 1986 notice.

In response to the Railroads' letter, on April 24, 1986, the RLEA moved for a temporary restraining order and for a preliminary injunction in the Maine RLEA case. The Railroads and Guilford opposed these motions. Judge Carter undertook to study the materials submitted and scheduled a hearing on the RLEA's motion for a temporary restraining order for Friday, April 25, 1986, at 3:00 p.m.

On Friday morning, the Unions went out on strike. Previously, many of the Unions' members had been honoring the BMWE picket lines and other members of the Unions were reporting to work where BMWE was not picketing. On April 25, 1986, virtually all of the Unions' members refused to report to work. Rather, they joined BMWE pickets at some sites and established their own picket lines at locations that BMWE had not been picketing, including commuter rail facilities in the Boston area. This action had an immediate and widespread effect on commuters in Greater Boston and those who rely on them.

The B & M commuter rail services usually provide daily transportation for about 25,000 Greater Boston residents, 13,000 on the South Shore line and 12,000 on the North Shore line. April 26, 1986 Affidavit of James R. Stoetzel at p. 2 (hereinafter "Stoetzel Aff.") The BMWE picketing resulted in the shutting down of all commuter service on the 12,000 passenger North Shore line from March 12, 1986 to March 24, 1986. Id. at p. 3. The agreement not to picket facilities serving only commuters relied upon by Judge McNaught when he denied the MBTA's request to enjoin certain BMWE picketing on March 12, 1986, caused the restoration of service to about 5,500 passengers on the North Shore line. Id. at pp. 3–4. The BMWE picketing did not result in closure of the South Shore line commuter service at any time. Id. at p. 4. Thus, on April 25, 1986, the date of the strike at issue here, the B & M was providing daily commuter service to more than 18,000 people. The Unions' strike on that date shut down all commuter services, on the South Shore line, as well as on the North Shore line. May 1, 1986 Affidavit of John J. Cronin ¶ 3 (hereinafter cited as the "Cronin Aff."). This strike action, among other things, frustrated the arrangement between the MBTA and the BMWE to keep commuter rail services functioning.

The Unions' April 25, 1986 strike did not have comparable effects in Maine. In this case, counsel for the Unions initially indicated that the April 25, 1986 strike had no effect on the public in Maine because the Unions had previously withdrawn their services throughout Maine. This representation was subsequently supplemented by evidence that the strike closed several paper mills in Maine. May 2, 1986 Affidavit of Eugene F. Lyden ¶ 5 (hereinafter cited as "Lyden Aff."). The Unions also represented that the April 25, 1986 strike stopped certain railroad operations in Virginia, Pennsylvania, and New York. May 2, 1986 Affidavit of Oscar Dederian, Sr. ¶ 6.

On the afternoon of Friday, April 25, 1986, the RLEA withdrew its motion for a temporary restraining order and asked Judge Carter to allow discovery and to schedule a hearing within three weeks on its motion for a preliminary injunction. See Transcript of Hearing on Motion for Temporary Restraining Order in RLEA v. Guilford et al. ("Tr.") at 8. At the same

time, the Railroads orally requested a temporary restraining order to enjoin the Unions from continuing their strike. Judge Carter declined to accept the oral motion, but informed the Railroads that they could file their motion in writing. Tr. at 5.

The next day, Saturday, April 26, 1986, the Railroads filed this action and their motion for a temporary restraining order in the Federal District Court for the District of Massachusetts. Judge Keeton, acting as Emergency Judge, held a hearing and issued the Temporary Restraining Order (Exhibit A hereto) suspending implementation of the policies described in the Railroads' April 21, 1986 notice, thus temporarily removing the cause of the Unions' strike, and temporarily restraining the strike as well.

On April 29, 1986, the Unions filed their motion to dismiss for failure to state a compulsory counterclaim or, in the alternative, to stay or transfer this action for consolidation with the Maine RLEA case.

On April 29, 1986, this court held a scheduling hearing and invited the MBTA and the U.S. Attorney for the District of Massachusetts to consider seeking to intervene in this case.[3] On May 1, the MBTA filed a motion to intervene pursuant to Fed.R.Civ.P. 24(a).[4]

On May 1, the Court held a hearing on the Unions' motion to dismiss, stay, or transfer. After hearing arguments from the Unions and the Railroads, and amicus argument from the MBTA, the court took this matter under advisement.

---

**3.** The court invited the United States Attorney to consider seeking to intervene because 45 U.S.C. § 152, Tenth allows the United States Attorney to participate in civil proceedings to require utilization of the "major dispute" procedures prescribed by 45 U.S.C. § 152, Seventh and § 156. The Railway Labor Act, 45 U.S.C. § 152, Tenth, also authorizes criminal prosecutions for any "willful" failure to exhaust the major dispute procedures. As of April 29, 1986, the Unions and the Railroads had each asserted the other's actions were unlawful because the major dispute procedures prescribed by 45 U.S.C. § 152, Seventh and § 156 were applicable and had not been followed.

## II. DISCUSSION

### A. The Complaint in This Case Does Not Constitute a Compulsory Counterclaim in the Maine RLEA Case

The Unions initially assert that this case must be dismissed because the Railroads' complaint in this case constitutes a compulsory counterclaim in the Maine RLEA case and must be asserted there. Rule 13(a) of the Federal Rules of Civil Procedure, which concerns compulsory counterclaims, provides in pertinent part: "A pleading shall state as a counterclaim any claim *which at the time of serving the pleading* the pleader has against any opposing party...." (Emphasis added).

■ The complaint in the Maine RLEA case was filed on March 24, 1986, and has not been subsequently amended. The Railroad answered on April 16, 1986. The Railroads' notice of intent to hire permanent replacements and thus alter collectively bargained rights of Union employees was not issued until April 21, 1986. It was this notice which resulted in the Unions' April 25, 1986 strike that this action seeks to enjoin. Thus, the Railroads' claim that the Unions' strike is unlawful and should be enjoined could not have been asserted when the Railroads answered the complaint in the Maine RLEA case on April 16, 1986.

■ It is clearly established that:
[A] party need not assert a counterclaim that has not matured at the time he serves his pleading. This is derived from the language in the rule limiting its application to claims the pleader has "at the

---

The court invited the MBTA to consider seeking to intervene because of a concern that the interests of Greater Boston commuters, which the MBTA represents in its case against the BMWE in Massachusetts, would not be adequately represented in this case by the Railroads and the Unions, and the relief obtained by the MBTA in its case could be rendered meaningless by decisions in this case.

**4.** The court has not considered it appropriate to act on the MBTA's motion to intervene prior to deciding whether to dismiss, stay, or transfer this case.

time of serving his pleading." A counterclaim acquired by defendant after he has answered will not be considered compulsory, *even if it arises out of the same transaction as does plaintiff's claim.* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1411, at 55 (1971) (emphasis added). *See Young v. City of New Orleans,* 751 F.2d 794, 801 (5th Cir.1985); *Cochrane v. Iowa Beef Processors,* 596 F.2d 254, 264 n. 9 (8th Cir.1979), *cert. denied sub·nom. Iowa Beef Processors v. Hawkins,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Stahl v. Ohio River Co.,* 424 F.2d 52, 54–55 (3d Cir.1970); *Goudchaux's, Inc. v. Wohl Shoe Co., Inc.,* 541 F.Supp. 463, 465 (E.D.La.1982).

Thus, the Railroads' complaint in this case is not a compulsory counterclaim in the Maine RLEA case and may not be dismissed by virtue of Rule 13(a). Rather, the question of whether this case should be dismissed, stayed or transferred is, as discussed below, a discretionary·matter.

### B. *Ordinarily, Parallel Proceedings Involving the Same Parties and Raising Closely Related Issues Should be Avoided*

·This case and the Maine RLEA action now present this court and the District Court for Maine, respectively, with the integrally related issues of (1) whether the actions proposed in the Railroads' notice of April 21, 1986, are legally permissible and (2) whether the Unions' strike in response to that notice is unlawful. In addition, the parties and the relief sought, at least by the Unions, are virtually identical in the two cases.[5]

As the Court of Appeals for the Fifth Circuit has stated:

> The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs. *E.g., Kerotest Mfg. Co. v. C–O Two Fire Equipment Co.,* 342 U.S. 180 [72 S.Ct. 219, 96 L.Ed. 200] (1952); *Covell v. Heyman,* 111 U.S. 176 [4 S.Ct. 355, 28 L.Ed. 390] (1884). "As between federal district courts, ... the general principle is to avoid duplicative litigation." *Colorado River Water Conservation District v. United States,* 424 U.S. 800 [96 S.Ct. 1236, 47 L.Ed.2d 483] (1976) (dictum). The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result.

*West Gulf Maritime Association v. ILA Deep Sea Local 24,* 751 F.2d 721, 728–29 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 133, 88 L.Ed.2d 110 (1985) (citations omitted). Each of the elements embraced by the concept of comity is implicated in the Unions' motion to dismiss, stay, or transfer this case.

The initiation of this action has already caused duplicative litigation. The issues relating to the legality of the actions described in the April 21, 1986 notice were undoubtedly considered by Judge Carter in preparing for the anticipated April 25, 1986 hearing on the Unions' motion for temporary restraining order. They have now also been considered by this court. If the labor dispute giving rise to this case is lengthy, such duplication of effort could often occur if parallel actions are allowed to persist.

The initiation of this action also raises the prospect of piecemeal resolution of related issues. The Unions in the Maine RLEA case have been seeking declaratory and injunctive relief to prevent, among other things, the Railroads from making any

---

**5.** The only party in the Maine RLEA case not included in this action is Guilford, the parent corporation of the Railroads. The Railroads have questioned whether there is an identity between the RLEA and the Unions, which the RLEA claims to represent in the Maine RLEA case; the Unions' decision to strike while the RLEA was seeking a temporary restraining order gives some credibility to this concern. At the May 1, 1986 hearing, however, the Unions represented that they and their members would submit themselves directly to the jurisdiction of the U.S. District for Maine by seeking to become parties to the Maine RLEA case.

change in any labor agreement or established practice concerning them during the BMWE strike without first obtaining judicial authorization to do so.[6] The April 21, 1986 notice announces the type of change from which the RLEA has been seeking in Maine to be protected. It is obviously inefficient to have some such proposed changes litigated in Maine and others in Massachusetts. Moreover, for this court to rule on the Railroads' motion for preliminary injunction, it would have to decide immediately the issue of whether prior court approval is needed for the Railroads to implement the actions announced in the April 21, 1986 notice. This would interfere with Judge Carter's authority to rule on that precise question, which is presented in the Union's motion for preliminary injunction now before him, and on the general question of whether prior court approval is needed for certain actions by the Railroad.

Of even more significance, parallel proceedings on closely related, challenging issues involve the prospect of inconsistent results. Inconsistent results would create conflicting obligations with regard to issues addressed by the court. They would also injure the ability of the parties to conform their conduct to their legal obligations with regard to issues not decided by the court because such obligations would be unusually uncertain. Such circumstances would encourage otherwise unnecessary litigation. "Moreover, such a situation is conducive to a race of diligence among litigants for a trial in the District Court each prefers." *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 26, 80 S.Ct. 1470, 1474, 4 L.Ed.2d 1540 (1960). This practice is definitely to be discouraged.

■ Thus, it appears to this court that, " '[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously.' " *West Gulf Maritime Association*, 751 F.2d at 729 (quoting *Washington Metropolitan Area Transit Authority v. Ragonese*, 617 F.2d 828, 830 (D.C.Cir.1980)).

## C. The District Court of Maine Should Decide the Propriety of Separate Cases and the Preferable Venue if They are to be Consolidated

■ It also appears to this court that, as the Court of Appeals for the Fifth Circuit has stated:

> "Once the likelihood of substantial overlap between ∴... two suits [has] been demonstrated, it [is] no longer up to the [second court] to resolve the question of whether both should be allowed to proceed. By virtue of its prior jurisdiction over the common subject matter ... the ultimate determination of whether there *actually* [is] substantial overlap requiring consolidation ... belong[s] to [the first court]."

*West Gulf Maritime Association*, 751 F.2d at 730 (quoting *Mann Manufacturing Inc. v. Hortex Inc.*, 439 F.2d 403, 405 (5th Cir. 1971)).

■ For several reasons, it is particularly fitting that Judge Carter decide whether parallel proceedings in this matter are appropriate and, if not, the preferable forum for the consolidated cases. The Maine RLEA case was pending for more than a month before him prior to the filing of this action. The precise issue of the legality of the Railroads' actions announced in the

---

**6.** Paragraph 2 of the prayer for relief in the Maine RLEA case requests the following:

2. Interlocutory and then permanent injunctive relief directing defendants, their officers, agents and all persons acting on their behalf from (a) discharging any employee for exercising his lawful right to honor BMWE's picket lines established on defendants' properties; (b) communicating with employees regarding the exercise of their constitutional and statutory right to honor BMWE picket lines on

defendants' properties, except as provided in Relief No. 3, *infra;* (c) any other activity which chills or impedes an employee in the exercise of his constitutional and statutory right to honor BMWE's picket lines on the defendants' properties; and (d) changing or suspending any labor agreement or established practice during the BMWE strike without first obtaining judicial authorization to do so.

April 21, 1986 notice, which is inherent in the Railroads' request to restrain the Unions' strike in this case, was presented to him in Maine by the Union two days before the commencement of this case in Massachusetts. Based upon his experience in the Maine RLEA case and the perspective gained from the three BMWE cases assigned to him, Judge Carter may have information and insights relating to the most appropriate forum for these two cases which are not available to this court. Finally, this court recognizes that, as a practical matter, it may not properly require that the present Maine and Massachusetts cases be consolidated in Massachusetts, even if it believed Massachusetts to be the preferable forum. Rather, denial of the Unions' motion to dismiss, stay, or transfer in the present posture of the two cases would practically assure the perpetuation of parallel proceedings, which appears to this court to be inappropriate.

In cases such as this, a stay of the second-filed action is appropriate to permit the court of first-filing to rule on a motion to transfer. *West Gulf Maritime Association*, 751 F.2d at 729 n. 1. *See Landis v. North American Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed.2d 153 (1936); *Kistler Instrumente A.G. v. PCB Piezotronics, Inc.*, 419 F.Supp. 120, 123 (W.D.N. Y.1976) (the power to grant a stay is directed to the sound discretion of the court and turns on the extent to which issues and parties in the two actions are identical). At the May 1, 1986, hearing the Railroads represented that they would promptly file a motion to dismiss, stay, or transfer the Maine RLEA case to Massachusetts if afforded an opportunity to do so. Thus, this case will be stayed to permit the Railroads to raise before Judge Carter the questions of the propriety of parallel proceedings and the preferable venue if the cases are to be consolidated. This court will rule on the Unions' motion to dismiss, stay, or transfer after Judge Carter has made his decision.

### D. *There is Good Cause to Extend The Temporary Restraining Order*

■ Neither the District Court of Maine nor this court can properly proceed to hear the Unions' or the Railroads' requests for preliminary injunctive relief before the issues of parallel proceedings and venue are resolved. It is important, however, that the status quo not be altered and the public interest not be irreparably injured while these issues are addressed.

The Temporary Restraining Order entered by Judge Keeton on April 26, 1986, in effect grants the equitable relief requested by the Unions in the Maine RLEA case by restraining implementation by the Railroads of the actions described in the April 21, 1986 notice, thus removing temporarily the cause for the Unions' strike. It also grants temporarily the relief requested in Massachusetts by the Railroads by restraining the strike.

In view of all of these circumstances, this court finds there is good cause to extend the April 26, 1986 Temporary Restraining Order for ten days, until May 16, 1986. *See* Federal Rule of Civil Procedure 65(b); *see also United States v. United Mine Workers*, 330 U.S. 258, 301, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947).

### E. *Considerations Concerning Appropriate Venue*

This court is ordinarily reluctant to comment on questions it is not necessary to decide. The question whether Maine or Massachusetts is a more appropriate forum for the pending cases if they are consolidated is such a question. This court did, however, give intensive consideration to this question before determining that it would be more appropriate to defer to Judge Carter on the issue. Because the time for consideration of this question in the Maine RLEA case may be short, and because it is desirable to minimize duplication of effort by the courts, it may be helpful to the court and to the parties to have the benefit of the following observations, which seem appropriate in the circumstances of this case.

Although the forum of the first-filed case will usually become the venue for later, related cases, this is "not ... a rigid rule."

*Small v. Wageman,* 291 F.2d 734, 736 (1st Cir.1961). The "problems of multiple litigation in the federal judicial system are not to be solved by rote.

"Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems. The factors relevant to wise administration here are equitable in nature".... *Kerotest Mfg. Co.,* 342 U.S. at 183, 184, 72 S.Ct. at 221, 222.

*Id. See Church of Scientology of California v. U.S. Dept. of Army,* 611 F.2d at 738, 749–50 (9th Cir.1979) ("[T]he handling of multiple litigation involving the same subject matter does not lend itself to '... rigid mechanical solution.' ... [As] the Eighth Circuit observed in *Florida v. United States,* 285 F.2d 596 (8th Cir.1960) ... '[t]here is no rigid or inflexible rule for determining priority of cases pending in federal courts involving the same subject matter.' "); *Codex v. Milgo Electronic Corp.,* 553 F.2d 735, 737 (1st Cir.), *cert. denied* 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 133 (1977) (first-filed rule is subject to exceptions).

Thus, a decision concerning the appropriate forum for the dispute between the Railroads and the Unions arising out of the April 21, 1986 notice requires a careful weighing of a combination of equitable factors, giving ample weight to any special factors counselling for or against the exercise of jurisdiction. *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.,* 600 F.2d 1228, 1233–34 (7th Cir. 1979).

At the outset it should be recognized that the district courts in Maine and Massachusetts are each able to decide cases involving citizens and interests of both states, and other states, promptly and properly. They do so daily. This is not a factor to be weighed in choosing the most appropriate of two reasonable forums.

In addition to the considerations of comity described earlier, the equitable factors which should be weighed in determining the most appropriate forum for this dispute are substantially reflected in 28 U.S.C. § 1404(a), which relates to changes of venue. The statute provides that:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any district or division where it might have been brought.

While the Railroads have presented evidence indicating that Massachusetts is a more convenient forum for the parties and their representatives, and the Unions have presented evidence that Maine is a more convenient venue, there is not a meaningful difference between the two states with regard to the convenience of the present parties. There is some merit in each of their arguments, but both the Unions and the Railroads have shown they can litigate effectively in Maine and Massachusetts.

The general issues raised in the Maine RLEA case seeking declaratory and injunctive relief concerning the Railroads' ability to change labor agreements or practices concerning the Unions' members who honor the BMWE picket lines affect meaningful numbers of Union employees in Maine, Massachusetts, and elsewhere. The related issue of the efficacy of the April 21, 1986 notice, which is at the heart of the requests for preliminary injunction in Maine and Massachusetts, has comparable effects on Union members in Maine, Massachusetts, and elsewhere. Thus, these considerations do not seem to be weighty factors in distinguishing between Maine or Massachusetts for the purposes of venue.

The April 21, 1986 notice and the ensuing strike, however, appear to have had considerably greater impact on the public in Massachusetts than in Maine. This observation suggests that any future strike by the Unions relating to the Maine RLEA case will also have a much greater impact in Massachusetts than in Maine.

Counsel for the Unions represented on April 29, 1986, and reaffirmed on May 1, 1986, that to the best of their knowledge the Unions' strike on April 25, 1986 had no effect on the public in Maine because the

Unions had previously withdrawn their services throughout Maine by honoring the BMWE picket lines. On May 2, 1986, this representation was qualified by an affidavit indicating that the strike had closed several paper mills in Maine.

The effects of the April 25, 1986 strike in Massachusetts were widespread and immediately evident. Commuter rail service to over 18,000 individuals who were not affected by the BMWE strike was shut down, injuring them and those who rely on them. This shut down eviscerated the arrangement to keep commuter rail service operating on which the U.S. District Court for the District of Massachusetts relied on March 11, 1986, in denying a request by the MBTA to preliminarily enjoin the BMWE strike as it affected commuter terminals.

As noted previously, this court invited the MBTA to seek to participate in this case because of a concern that the interests of commuters which it represents in its case against the BMWE in Massachusetts before Judge Keeton would not be adequately represented in the present case by the Railroads or the Unions, and the relief obtained by the MBTA in its case could be rendered meaningless. The MBTA is a likely party if this case remains in Massachusetts. Massachusetts is a more convenient forum for it, and convenience in this case might have special consequences. If an unlawful strike occurs, time would be of the essence in preventing or minimizing the irreparable harm caused by even a day's disruption of commuter service.[7]

Finally, as many members of the public in Massachusetts may be affected by decisions in the RLEA case, making proceedings in that case accessible to them, directly or through local media, is an element of the public interest to be considered in determining the appropriate forum. As the United States Supreme Court has said, "In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). This point is an amplification of the important principle that court proceedings be open to the public absent some compelling countervailing consideration. This concern is a special factor which seemingly did not exist in any of the reported decisions regarding whether the forum of first-filing or second-filing was the most appropriate venue for cases to be consolidated.

The foregoing should not be construed to suggest that this court believes that it would be wrong or unreasonable for the District Court of Maine to conclude that it is the most appropriate forum for the RLEA case and related disputes. The RLEA chose Maine first and that decision deserves weight. More important, Judge Carter has experience in the RLEA case and related BMWE cases which may provide information or perspectives, not available to this court, but valuable to a considered judgment concerning the most appropriate venue. Judge Carter may wish to consider the foregoing observations as well. As elaborated earlier, however, the decision as to which of two reasonable forums is the preferable forum should be made by Judge Carter.

### ORDER

In view of the foregoing, it is hereby ORDERED that:

1. The Unions' Motion to Dismiss for Failure to State a Compulsory Counterclaim is denied.

---

7. A related point concerns the efficiency and effectiveness of enforcing any equitable relief which may be granted against Unions and their members in Massachusetts. If, as they propose, the Unions and their members become parties to the Maine suit, the District Court would certainly have jurisdiction over them. It could, however, take the District Court of Maine longer than the District Court of Massachusetts to cause such entities or individuals to appear or to enforce orders in Massachusetts. Similarly, the Railroads have represented that their principal officers involved in this dispute work in Massachusetts. Thus, Massachusetts may be the most efficient forum for enforcing any possible injunction directed to them.

2. This action is stayed until further order of this court.

3. The Temporary Restraining Order dated April 26, 1986, attached hereto as Exhibit A and incorporated herein, shall continue in full force and effect until 4:00 p.m. on Friday, May 16, 1986.

4. If the Railroads that are plaintiffs in this action wish to file in the District Court for Maine a Motion to Dismiss, Stay, or Transfer to Massachusetts the case of *Railway Labor Executives' Association v. Guilford Transportation Industries, Inc. et al.*, Civil Action No. 85–0122–P, they shall do so by the close of business on May 7, 1986. If they do not do so, this court will assume that the Railroads prefer that this case be transferred to Maine.

### EXHIBIT A

### TEMPORARY RESTRAINING ORDER

This matter came on to be heard upon a verified complaint, motion for temporary restraining order, and supporting memorandum and affidavits filed by the plaintiff rail carriers, from which it appears that the defendants have commenced strikes and picketing against the plaintiffs in violation of the Railway Labor Act and Interstate Commerce Act. The strikes and picketing will cause immediate and irreparable injury to plaintiffs, their shippers, their employees and to the public generally, if not enjoined until a hearing can be had and an order entered upon a motion by plaintiffs for a preliminary injunction.

IT IS THEREFORE ORDERED, but on the condition added by the court as paragraph 6:

1. That the defendants, their divisions, lodges, locals, officers, agents, employees, and members, and all persons acting in concert with them, be and they are hereby temporarily restrained from authorizing, calling, continuing, encouraging, permitting, or engaging in any picketing of the plaintiffs, or any of the plaintiffs' connections or shippers, over the matters alleged in the complaint herein until such time as a final hearing is had and a final judgment entered upon the complaint herein;

2. That this temporary restraining order is granted upon the condition that an undertaking in the sum of $50,000 or cash in that amount, be filed to make good such damages not to exceed said sum as may be suffered or sustained by anyone who is found to be wrongfully enjoined or restrained;

3. That a hearing shall be had before this court at two o'clock p.m. on May 1st, 1986, upon plaintiffs' motion for preliminary injunction;

4. That this temporary restraining order shall expire at four o'clock p.m. on May 6th, 1986, unless it is further extended by an order of this court; and

5. That this temporary restraining order may be served by any person over the age of eighteen years selected for the purpose by any of the plaintiffs.

6. That the plaintiffs suspend, and take no action for the duration of this restraining order, implementing in any way the policy and practice declared in their notice of April 21, 1986.

Date: 6:36 o'clock p.m., April 26, 1986

/s/ Robert E. Keeton
United States District Judge